## JOHN SCOTT et al. v. PARKVIEW REALTY AND IMPROVEMENT COMPANY, Appellant.

### Division Two, February 17, 1914.

1. **SECOND APPEAL: Controlled by Law of First Appeal.** Where the evidence upon a second appeal is substantially the same as that on the first, and the same points are urged by appellant and supported by practically the same authorities, the law as declared upon the first appeal is controlling upon the second.

2. ————: ————: **Instructions: Overhaul: Prior Settlement.** In a suit arising out of a difference as to payments for overhaul in grading lands, plaintiffs' instructions covering the manner in which the jury should arrive at the amount due for overhaul, if any, and governing the finding as to a prior settlement pleaded by defendant, are held to be proper and to conform to the law as laid down upon a former appeal of the same case.

3. **CONTRACTS: Liquidated Damages: Abrogated by Modification.** The original contract between plaintiffs and the defendant for grading lands provided for liquidated damages if plaintiffs should fail to complete performance by a time specified. The contract was modified and the time for completion extended, the provision for liquidated damages being retained. Upon a second modification of the contract, however, the provision was omitted, the modified contract providing that the maximum amount of yardage defendant could demand should be increased, and that if portions of the land to be graded should be required for use before the time specified for completion, the plaintiffs would, upon notice, complete such portions without delay and within such reasonable time as should be determined by the engineer in charge. *Held*, that under such circumstances the provision as to liquidated damages was abrogated by the force and effect of the last modification.

4. **INSTRUCTIONS: Not Requested: Motion for New Trial.** An appellant in a civil case cannot complain of a failure to give an instruction when he neither requested such instruction at the trial nor urged the failure to give it as error in his motion for a new trial.

5. **EVIDENCE: Payment of Corporation's Stock: Conveyance of Lands: Deed.** Where there was evidence that the stock of defendant corporation was paid by a transfer of real estate to the company and that the "Catlin" tract was a part of the

property so conveyed, the deed showing the conveyance of the "Catlin" tract was properly admitted in evidence, and, aside from this, when the deed was offered in evidence the plaintiff simply objected without assigning any reason why the deed should be excluded and does not, on appeal, cite any authority or suggest any reason why its admission might have been erroneous.

6. **INSTRUCTIONS: Corporation's Articles of Agreement: Reliance Upon.** Where there was no evidence that plaintiffs had any knowledge concerning statements contained in the articles of agreement of defendant corporation or that they relied upon the statements made therein, it was not error for the trial court to strike from an instruction on that point the words: "And this statement by the incorporators of said company was a statement made to the Secretary of State of Missouri for the purpose of obtaining a charter for the company, and was not such a statement upon which the plaintiffs had a right to rely."

7. **QUANTUM MERUIT: Contract Price Prima-Facie Evidence of Reasonable Value.** In an action on a *quantum meruit* for balance due for overhaul in grading lands, the price stated in the original contract for the work is prima-facie evidence of its reasonable value.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney*, Judge.

AFFIRMED.

*Collins, Barker & Britton, M. P. Murray* and *Dawson & Garvin* for appellant.

(1) "In order that a decision may operate as an estoppel on a subsequent appeal of the same case the question must have been fairly presented to the court as necessary to a decision in the case and directly considered and decided. Parties should not be concluded upon questions that are decided upon mere implications arising from the general disposition of the case or those which were merely collateral to the matter actually considered." Gwin v. Wagoner, 116 Mo. 151; Ables v. Ackley, 133 Mo. App. 600; Gannon v. Pauk, 200 Mo. 97; Bird v. Sellers, 122 Mo. 32; Chambers v.

Smith, 30 Mo. 156; Shoe Mach'y Co. v. Ramlose, 231 Mo. 508; Hamilton v. Marks, 63 Mo. 167; Bank v. Donnell, 195 Mo. 571; Kelly v. Thuey, 143 Mo. 437; Holmes v. Loan Assn., 166 Mo. App. 730; Bagnell v. Railroad, 242 Mo. 21; Railroad v. Cundeff, 184 Fed. 891. (2) Under a proper interpretation of the grading contracts sued upon the final estimate and certificate of the engineer was made in good faith, was based on correct engineering principles and binding on the parties. McGregor v. Construction Co., 188 Mo. 611; Williams v. Railroad, 153 Mo. 487; Howard County v. Baker, 119 Mo. 407; Chapman v. Railroad, 114 Mo. 549; McCormick v. St. Louis, 166 Mo. 315; Iron Co. v. Halverson, 48 Mo. App. 383. (3) While in the construction of contracts, words are usually to be taken in their ordinary or popular sense, yet a particular or general custom or usage may be proved to vary the usual meaning or to show that words are used in a special sense. Under all the evidence in the case, the word "haul," as usually and customarily employed by engineers and contractors in and about St. Louis at the time, meant the shortest practicable distance between cut and fill, and "haul" was measured in that way. This was in contemplation by the parties when the contract was entered into. The adoption of a long and circuitous route by respondents for their economy and convenience did not entitle them under such circumstances to payment at the contract price on the basis of such long and circuitous route. Under such circumstances, the failure of the engineer to object, did not amount to an authorization to plaintiffs to charge defendant with an additional sum of over $77,000 on account of a longer route adopted by them because of its being cheaper to them than the shortest practicable route. (4) The respondent, by acting upon the final estimate, and accepting from appellants the sum of $76,497.70, in full of all claims, and by still holding and retaining the money, gave to the

final settlement the force and effect of an account stated. McCormick v. St. Louis, 166 Mo. 315; Coal Co. v. St. Louis, 145 Mo. 651; McCormick v. Transit Co., 154 Mo. 191; Adams v. Helms, 55 Mo. 468; Lindersmith v. Land Co., 31 Mo. App. 258. (5) There was a completed settlement, accord and satisfaction. Maack v. Schneider, 51 Mo. App. 92; Brink v. Garland, 58 Mo. App. 356; Tumilty v. Tumilty, 13 Mo. App. 444; Franklin v. Railroad, 97 Mo. App. 473; Cogan v. Railroad, 101 Mo. App. 179; Pickel v. Chamber of Commerce, 10 Mo. App. 191; Marshall v. Larkin's Sons, 82 Mo. App. 636; Rawlins v. Rawlins, 102 Mo. 563; Tansey v. Railroad, 90 Mo. App. 101; Knorp v. Wagner, 195 Mo. 637; Coal Co. v. St. Louis, 145 Mo. 653; Darwin v. Westbrook, 71 Hun, 405; Boteler v. Roy, 40 Mo. App. 234; School Board v. Hull, 72 Mo. App. 409; Henson v. Stever, 69 Mo. App. 136; Gens v. Hargadine, 56 Mo. App. 245; Reilly v. Chaoquette, 18 Mo. 220; State ex rel. v. Ewing, 116 Mo. 136. (6) Such settlement is so far conclusive between the parties that it cannot be reopened either at law or in equity, except upon clear and convincing proof of fraud or mistake, and never where, as here, the party attacking the settlement was aware, when he made it, of the facts upon which he bases his claim for relief. There is no claim that there was a mistake here, and there is an entire failure of proof of any fraud. McCormick v. Transit Co., 154 Mo. 191; Pickel v. Chamber of Commerce, 10 Mo. App. 191; Lindersmith v. Land Co., 31 Mo. App. 258; Dengler v. Auer, 55 Mo. App. 548; Marmon v. Waller, 53 Mo. App. 610; Kronenberger v. Binz, 56 Mo. 121; Kent v. Highleyman, 28 Mo. App. 614; Buffington v. Land Co., 25 Mo. App. 492; Marshall v. Larkin's Sons, 82 Mo. App. 635; Quinlan v. Keiser, 66 Mo. 603; Cannon v. Sandford, 20 Mo. App. 590; Morgan v. Joy, 121 Mo. 682; Draper v. Owsley, 15 Mo. 613; Mitchell v. Henley, 110 Mo. 598; Gens v. Hargadine, 58 Mo. App. 245. (7) (a) The reply did not state facts

sufficient to avoid the release. (b) There was no fraud, duress, or coercion in the procurement of the settlement. Bullock v. Woolridge, 42 Mo. App. 356; Davidson v. Hobson, 59 Mo. App. 130; Bryan v. Hitchcock, 43 Mo. 527; Parker v. Marquis, 64 Mo. 38; Hamilton v. Mallett, 8 Mo. App. 584; Vout v. Geraldin, 64 Mo. App. 165; Dausch v. Crane, 109 Mo. 332; Silliman v. U. S., 101 U. S. 465. There was no threat; the only threat was by plaintiffs. There was no evidence of any false statement. There was no evidence of any duress. There was no evidence of any concealment of available assets. Rule's statement to Scott was not a statement of a present or past fact or condition. It was not even an expression as to the future. It was not even a prophecy. At most it was a mere expression that one of two things might happen. (8) Where, as in this case, the stock of a corporation has been paid for by a transfer to it of property and the stock has been issued as full paid and nonassessable, there is no further liability of the stockholder to the corporation and it cannot be said that the corporation has any claim against him for unpaid stock. As to all the world, except a creditor who has extended credit to the corporation upon the faith that its stock has been full paid, and without notice as to the manner in which it has been paid, the stock is full paid. Such a creditor may have a cause of action against the stockholder, but it is a right peculiar to the creditor, and not the right of the corporation, nor one which can be enforced in the right of the corporation and such liability is not an asset of the corporation. Bank v. Rockefeller, 195 Mo. 15; Webb v. Rockefeller, 195 Mo. 55; Woolfolk v. January, 131 Mo. 620; Bank v. Gillespie, 209 Mo. 217.

*Kinealy & Kinealy* for respondents.

(1) The decision of this court in banc on the first appeal became the law of the case for the subsequent

trial and this appeal. Taussig v. Railroad, 186 Mo. 289; Hayward v. Smith, 187 Mo. 464; Mill Co. v. Sugg, 206 Mo. 148; Railroad v. Bridge Co., 215 Mo. 286. (2) The greater part of appellant's brief discussing questions settled by the first appeal must be disregarded. When the Supreme Court in its opinion ordered "the cause remanded to be retried according to the views herein expressed," the lower court had no power to do anything else. Bridge Co. v. Stone, 194 Mo. 175. (3) Appellant's criticisms of the instructions given for respondents are without merit. (a) Instruction 3 follows Judge Valliant's opinion: Scott v. Parkview Co., 241 Mo. 123. (b) Instruction 5 follows the opinion of this court. Id., 133. (c) Instruction 6 follows that opinion also: Id., 136. The purchase price of property is prima-facie evidence of its value and the consideration named in the deeds is prima-facie true. Abbitt v. Transit Co., 104 Mo. App. 540; 13 Cyc. 613; Burkholder v. Henderson, 78 Mo. App. 294; Anderson v. Cole, 234 Mo. 4; Allen v. Kennedy, 91 Mo. 328; Wood v. Broadley, 76 Mo. 33; Fontaine v. Bank, 57 Mo. 561. The real owners of unpaid stock are liable thereon to creditors. Hotel Co. v. Wright, 73 Mo. App. 244; Business Men's Assn. v. Williams, 137 Mo. App. 588. And so also are persons who acquire the stock with knowledge of all the facts. Schneider v. Johnson, 161 Mo. App. 374; Berry v. Road, 168 Mo. 316. (4) There was no error in the court's instruction against the so-called counterclaim. That was founded on a contract and the evidence failed to show any agreement for liquidated damages because of failure to complete the work on October 1, 1903. No claim for unliquidated damages was made in the court below and defendant cannot now try the case here on a different theory. Hof v. Transit, 213 Mo. 445; St. Louis v. Contracting Co., 210 Mo. 491; Gordon v. Park, 202 Mo. 236; Williams v. Lobban, 206 Mo. 399. And

the evidence showed that appellant caused the delay and suffered no damage. Beattie Mfg. Co. v. Heinz, 120 Mo. App. 476; 30 Am. & Eng. Ency. Law, p. 1255. (5) Appellant has no standing to complain of the refusal of instructions, because of the excessive number asked by it. Desberger v. Harrington, 28 Mo. App. 632; Renshaw v. Ins. Co., 33 Mo. App. 394; Kinney v. Springfield, 35 Mo. App. 96; McAlester v. Barnes, 35 Mo. App. 668; City v. West, 157 Mo. 309. Moreover, all of defendant's instructions are drawn wholly regardless of the views expressed by this court on the former appeal. In addition to this, instructions based upon "false and fraudulent representations" submit questions or conclusions of law, which is erroneous. Best & Russell Co. v. Meyerfeld, 77 Mo. App. 181; Smith v. Sims, 77 Mo. 269; Hoester v. Sammelmann, 101 Mo. 619; Mateer v. Railroad, 105 Mo. 353; Nichols v. Stevens, 123 Mo. 96. (6) The contract price for services is prima-facie evidence of their reasonable value. Nelson v. Railroad, 113 Mo. App. 659; Ibers v. O'Donnell, 25 Mo. App. 120; Deardorff v. Eberhart, 74 Mo. 37; Water Co. v. Realty Co., 152 Mo. App. 300; Bambrick v. Webster Assn., 53 Mo. App. 225; Cozad v. Elam, 115 Mo. App. 136.

WILLIAMS, C.—Trial was had in the circuit court of the county of St. Louis, before a jury, resulting in a verdict and judgment in favor of plaintiffs upon the third count of their petition in the sum of $116,381.35. The case was tried upon the issues raised by the first and third counts of plaintiffs' petition, defendant's second amended answer and plaintiffs' reply. This is the second appeal in the case. The opinion upon the first appeal was rendered by Court in Banc and is reported in 241 Missouri at page 112. The pleadings upon the part of the plaintiffs are the same as they were upon the first trial.

By this suit plaintiffs seek to recover from the defendant company the sum of $77,933.94, with interest thereon, for an alleged balance due plaintiffs for work done in grading a large tract of land belonging to defendant and located near the city limits of the city of St. Louis. The first count of the petition was founded upon contract and the third count upon *quantum meruit*. The second amended answer pleads settlement, accord and satisfaction and a counterclaim for liquidated damages in the sum of $32,500 for failure to complete the grading work within the time provided by the grading contract and the extensions and modifications thereof. Aside from the pleading of the counterclaim the second amended answer, while containing more words, is, as to the issues raised, of practically the same effect as the answer upon the first trial. The reply is the same as upon the first trial. It contains a general denial and pleads confession and avoidance as to the settlement, accord and satisfaction set forth in the answer.

On February 12, 1902, plaintiffs and the defendant company entered into a written contract whereby plaintiffs agreed to do certain grading work upon a tract of land containing about three hundred acres which the defendant owned and was desirous of having graded and leveled preparatory to dividing the tract into residence lots and offering the same for sale to the public. The contract provided that the amount of grading should not be less than 1,400,000 nor more than 2,100,000 cubic yards of earth. The work was to be accomplished by cutting down the high portions of the tract and depositing the dirt therefrom into the valleys or lower levels of the tract. The work was to be done in a workmanlike manner and in conformity with directions given by Pitzman's Company of Surveyors and Engineers, as engineers of defendant company. The tract of land to be graded was approximately three times as long as it was wide; the long

way being east and west. The right of way of the Wabash Railroad Company entered the tract at the southeast corner thereof and ran diagonally across the eastern portion of the tract in a northwesterly direction. A short distance west of the Wabash Railroad Company's right of way the river Des Peres crossed the tract from south to north. Skinker Road ran north and south through the tract leaving about one-third of the entire tract west of Skinker Road. This roadway had been cut down so that it was approximately ten feet lower than the surface of the tract adjoining the roadway. The land adjoining Skinker Road was to be cut to a depth of about twenty-five feet and Skinker Road was to be lowered about fifteen feet. The tract of ground was bounded on the south by the right of way of the St. Louis, Kansas City and Colorado Railroad and on the north by Delmar boulevard. By the terms of the contract plaintiffs were to receive eighteen cents per cubic yard based upon an average haul of 1400 feet and three-fourths of a cent extra per cubic yard for every hundred feet of average haul over 1400 feet. The original contract provided that in the event plaintiffs should fail to complete the work by November 1, 1902, they should pay, as liquidated damages, the sum of $500 for each and every day's delay after that date and if the plaintiffs should complete the work prior to that date they would receive additional compensation of $100 per day for each and every day that the work was finished ahead of time. The contract contained the following provisions: "The engineer's opinion as to the increase of haul is to be binding on both parties. . . . And when all the work embraced in this contract is fully completed, agreeably to the specifications and stipulations of this agreement, and accepted by the engineer, said engineer shall cause a final estimate to be made of the amount and value of said work according to the terms and prices of this agreement.

Scott v. Realty & Improvement Co.

From the total amount so found he shall deduct all sums previously paid or rightfully retained, and certify the remainder as then due.  Provided further, that nothing herein contained shall be construed to affect the right of the second party, hereby reserved, to reject the whole or any portion of the work aforesaid should the said certificate be found or known to be inconsistent with the terms of this agreement, or otherwise improperly given.''

The contract was silent with reference to the routes over which the dirt was to be hauled and also silent as to what appliances should be used in doing the work.  On November 9, 1902, in consideration of certain modifications of the original contract the defendant company, by written agreement, extended the time for completion of the work from November 1, 1902, to July 1, 1903, and provided that the clause providing for the payment to the plaintiffs of the sum of $100 per day for each day that the contract might be finished ahead of time should be canceled but that the modification should not in any wise be taken to limit the right of the defendant company to receive stipulated damages for each day's delay in completing the work after July 1, 1903.  Later (the date is not given) the contract was modified by a further written agreement signed by both parties whereby the time for completion of the work was extended from July 1, 1903, to October 1, 1903, upon the conditions that the plaintiffs agree, upon notice from the engineer in charge, to complete all work on such portions as should be required for actual use and disposition prior to November 1, and as a further consideration of such extension it was agreed that the maximum amount of grading should be increased to 2,250,000 cubic yards, and further provided that the defendant might, in his discretion, have other parties do filling on said land with earth excavated outside of said land.  Said written agreement provided that the original contract and

the modifications thereof were modified and amended to conform with the provisions of the last agreement. The total amount of dirt handled by plaintiffs was 2,053,595 cubic yards and concerning the amount of yardage there was no dispute.

This whole controversy arises over the determination of the length of the average overhaul. Plaintiffs contend that the average haul for the entire work was 2166 feet, which would leave the average overhaul to be 766 feet. Defendant contends that the average length of haul on the entire work was 1660 feet, which would leave the average overhaul 260 feet. Prior to the institution of this suit the defendant company had paid the plaintiffs the total sum of $426,022.70, which was the total sum that the work would amount to, if the average overhaul was 260 feet as contended by defendants. This suit is to recover for the haul of the total yardage the further distance of 506 feet. The work was completed about December 5, 1903. At that time the plaintiffs had received from the defendants the total sum of $349,525.10 on account. Mr. Pitzman, one of defendant's engineers, in charge of the work, made out a final estimate showing the balance which he claimed was due the plaintiffs to be $72,497.60. In this estimate he finds the average overhaul to be 260 feet. In said estimate he stated to the defendant company that the same was subject to their right to claim liquidated damages for failing to complete the work on time. Later it was found that the sum of $4000 which plaintiffs had borrowed from a trust company had been erroneously included in the final estimate as a payment on the work and this sum was added to the final estimate making the balance due, as estimated by the engineer, $76,497.60. The plaintiffs procured the services of an engineer to figure the amount of overhaul and according to his estimate the actual average overhaul was 766 feet, and using that as a basis there was then due plaintiffs $150,431.63, which increased by

the mistake in the sum of $4000, loaned instead of paid, would make the balance due, according to plaintiffs' estimate, to be $154,431.63. Afterwards, on February 1, 1904, under the circumstances hereinafter detailed, plaintiffs received from defendant the amount of defendant's final estimate, $76,497.70, and executed a receipt in full of all of plaintiffs' claims, contractual or otherwise, against the defendant company. Later this suit was instituted to recover the balance which plaintiffs claim was due them.

In doing the grading work, the plaintiffs moved some of the dirt by means of wagons, teams and scrapers and a part of the dirt by means of two steam shovels and cars, which cars were drawn by a steam engine over a trackway beginning at the west of Skinker Road and running south to the right of way of the Colorado Railroad, thence east along the right of way of said railroad to a point a short distance west of the southeast corner of said tract of land, at which point the trackway extended in a northeasterly direction, going over the Wabash Railroad's tracks upon an overhead bridge and over to the low land to the east of the Wabash Railroad where the dirt was deposited. Over this trackway 305,674 cubic yards of dirt were hauled. Plaintiffs contend that the average haul should be ascertained by measuring the respective hauls as they were actually made over the trackway. Defendant claims that the dirt could have been hauled a shorter practical route by team and wagon and that the overhaul should be determined by measuring the haul, not as actually made but by a route over which defendant's engineer claims the dirt could have been hauled in a practical manner by teams and wagons.

As to the controverted issues, the evidence upon the part of plaintiffs tends to establish the following facts: Plaintiffs informed defendant company prior to entering into the contract that they would use steam

shovels in doing part of the work. Pitzman's engineers were in charge of the work representing the defendant company. About three months after the contract was let the trackway over which the dirt from the steam shovels was hauled was laid and used from that time almost continuously until the work was completed. Before this trackway was laid a plan of the same, showing the route, was submitted to defendant's engineer, Mr. Pitzman, and he approved the same and made no objection to the route selected but assisted plaintiffs in securing the right to lay the tracks on the right of way of the Colorado Railroad and also the right to cross the Wabash Railroad by overhead bridge at the point crossed. That the route over which the tracks were laid was the only practical route and that the overhead crossing over the Wabash Railroad was placed at the only place the Railroad Company would permit. Pitzman, or some of his engineers, were on the ground, continuously, during the progress of the work; saw the route over which plaintiffs were hauling the dirt by the steam cars and made no objection. That the material could not have been hauled along a shorter or more practical route and that it was impossible to move all the dirt within the time limit by wagons and teams. During the early part of the work the average haul was less than 1400 feet and in making monthly estimates for said work, the engineer allowed plaintiffs for such underhaul an amount proportionate to the amount which said underhaul bore to the 1400 feet average haul provided in the contract. Later when the average haul exceeded 1400 feet, plaintiffs requested the engineer to allow them in his monthly estimate the added price for the haul over 1400 feet but the engineer refused to allow for overhaul at that time, saying that he would not figure the overhaul until the contract was completed. About the time the work was completed, Pitzman told plaintiffs that he would measure the overhaul the way it was actually made

and indicated on the map along the trackway as laid. At about the same time, one of Pitzman's engineers also told plaintiffs that Pitzman would measure the haul as actually made. A short time later, Pitzman refused to measure the haul as actually made, saying that it would amount to too much money and that the defendant would not pay it. Later, Mr. Pitzman compiled the above mentioned final estimate showing $76,497.60 as the balance due plaintiffs. Plaintiffs employed Mr. Russell, a civil engineer, to figure the overhaul and to make a final estimate for them, and he figured the average overhaul to be 766 feet and that defendant company owed plaintiffs on that basis $154,431.54. Russell's estimate was submitted to Mr. Pitzman and Pitzman wrote the defendant company that while he thought the plaintiffs would lose approximately $50,000 if they were paid according to his final estimate, yet he saw no reason for changing his estimate. Mr. Pitzman measured the haul, not as actually made, but, on a straight line from the cut to the fill along a practical route over which he claimed that the dirt could have been hauled by wagons and teams. Mr. Russell measured the haul as it was actually made.

Two conferences were held between plaintiffs and defendant company and their respective engineers. At these conferences, defendant did not claim liquidated damages against the plaintiffs but took the position that they would pay the amount of Mr. Pitzman's final estimate and no more, the only matter of dispute being as to amount of overhaul. During this time, one of the plaintiffs had a conversation with the president of the defendant company in which he said to defendant's president that they would not accept the amount of defendant's estimate and intimated that they would likely bring suit. To this defendant's president replied: "It may suit us just as well if you enter suit, because we have to borrow this $75,000 which we are going to pay you; if we pay you we have

to borrow it now to pay you; if you sue us it will put the case in court for three or four years and by that time we may have sold our property, and have money, or we may be busted and a judgment would not hurt us." About this time, one of plaintiffs went to Mr. Pitzman to see if he would not raise the estimate and Pitzman said, "Why don't you sue them, and they will compromise," and at a later date Mr. Pitzman advised plaintiffs to enter suit, and added, "I don't want you to mention my name." One of plaintiffs testified that after the talk with the president of the company, he made an investigation into the financial condition of the defendant company and came to the conclusion that they were putting in jeopardy the amount of money offered if they did not take it, and that those facts influenced them to accept the amount that was paid on February 1, 1904.

Plaintiffs further testified that no claim was ever made by the defendant company for liquidated damages and that the delay in completing the work was caused by failure of the defendant's engineer to furnish them the grade stakes within time. That at the time the money was received on February 1, 1904, plaintiffs did not know the manner in which defendant's capital stock was paid up. Prior to that time, one of plaintiffs, with his attorney, called upon the president of the defendant company to get information about the stock liability but the president of the company refused to give such information. That there was no custom at St. Louis that grading of this kind should be done by wagons and teams. One of plaintiffs' witnesses testified that the custom prevailing in St. Louis in reference to measuring hauls was that the haul was measured the way it was actually made, when the hauling was done where an engineer was in charge of the work, unless the engineer made a protest to the contractor concerning the route over which the dirt was hauled.

The evidence upon the part of the defendant as to the controverted issues tended to establish the following facts: Plaintiff did not inform defendant prior to the making of the contract that they would use a steam shovel on the work; but did tell them about the number of teams that would be used; defendant did not consent to the use of a steam shovel and to the hauling of the dirt over the route that it was hauled, but made no objection thereto; that the work could have been done within the time by the use of wagons and teams and that the measurements made by Mr. Pitzman on behalf of defendant were along the route that the dirt could have been hauled in a practical manner by the use of wagons and teams. On cross-examination some of defendant's witnesses testified that from the contractor's viewpoint the job was a steam shovel job and that the route over which the track was laid and the dirt hauled from the steam shovels was the most practical route for handling the dirt by the use of steam shovels. That the custom as to measuring the haul in and about St. Louis, at the time of doing this work, was to measure from the center of the cut to the center of the fill by a straight line except as to going around any obstacles not produced by the contractor. That if the haul was measured as actually made it would show an overhaul of about 509 feet, which would increase Pitzman's estimate $38,350.89.

Defendant's engineers denied telling plaintiffs that they would measure the haul as actually made. Mr. Pitzman testified that the trackway was laid over the only practical route available at the time it was laid and when plaintiffs submitted to him the plan of the route he said, "There is no objection, I will help you along the best I can." That he did not direct the way they should haul the dirt but made no objection thereto; that it was customary to do this kind of work with wagons and teams and that in measuring the

haul he calculated over the shortest practical route that wagons could have gone in hauling the dirt and that the custom was to measure the haul by the shortest practical route. On cross-examination, Mr. Pitzman testified that the reasonable value of the work was higher than the contract price and that this was the largest contract that he had ever been connected with in St. Louis City or County. Another engineer testified that ''practical route'' meant the shortest route that the dirt could be hauled by teams. Mr. Phillips, a civil engineer, witness for defendant, testified that the job could have been completed with teams within the time. On cross-examination he stated that the custom was to move dirt with either teams or steam shovels at the option of the contractor. That, if he had been engineer in charge of the work and seen the contractor moving dirt in a long way, he would have told the contractor that if he used that route, he would do so at his own risk. Witness testified that the cost of moving dirt by tramway was one-sixth to one-tenth of what it was by wagons and teams. Mr. Kinsey, engineer, testified for the defendant that there was no fixed custom that would apply to all grading work; that haul meant the shortest practical route over which the earth could be moved and that the work could have been completed by the use of teams within the time.

Mr. Coffin testified that he was present at the directors' meetings when the defendant was trying to settle with the plaintiffs and that the discussion was about the overhaul and that there was not much point made about the delay. That it was spoken of but never considered and that the word ''compromise'' was never used. Another of the defendant's directors testified that plaintiffs were not present at the board meeting when the question of delay was discussed. Another of defendant's directors testified that at the conference between plaintiffs and defendant one of

defendant's directors made the proposition to plaintiffs that in settlement and compromise of plaintiffs' claims and the question of damages for delay and the difference arising between engineers as to the long haul and practical haul the defendant would pay promptly in cash the amount of Pitzman's estimate and that one of the plaintiffs agreed to the proposition. This witness further testified that plaintiffs explained the delay as being caused by waiting for the engineer to give them some of the grades and that the board of directors in consideration of the explanation concerning the delay made the proposition to settle for the amount mentioned in Pitzman's final estimate. One of the directors of the defendant company testified that when one of plaintiffs intimated to him that they would bring suit unless more money was paid, he laughingly said, ''That will give us a delay and may be beneficial to us;'' but that he did not say anything about the end of the litigation; that he told one of the plaintiffs that the capital stock was five and one-half million dollars and that it was all paid up by transfer of real estate; that plaintiffs subscribed for $5000 of the second mortgage bonds of the defendant company; that the gist of the whole discussion as to final payment was that the company would pay whatever Pitzman reported as due plaintiffs. One of defendant's directors testified that before the settlement was made February 1, 1904, one of plaintiffs made the statement that he had consulted his attorney and found out he could reach the stockholders on their stock liability if they recovered judgment against the defendant. The president of the company further testified that at the time of trial the defendant company owned no property and had no money.

The evidence tending to show a stock liability was circumstantial in its character, that is, there was no direct, positive evidence that any certain person or persons owed for unpaid stock but it is fairly deduci-

ble from the evidence that there was a large stock liability owed by some of the persons receiving $3,500,000 of the common stock as a bonus for subscribing for $1,000,000 of the second mortgage bonds. The defendant company was organized as a real estate speculation, the amount of its capital stock being $5,-500,000—$5,000,000 being common stock and $500,000 being preferred stock. The date of the incorporation was November 13, 1901. The greater portion of the capital stock was originally subscribed for by clerks or agents who had no financial interest in the matter, but who held the stock and delivered it or had it reissued as the Lincoln Trust Company or defendant company would direct. The stock was attempted to be paid up by the transfer of real estate to the company. A part of this real estate was the one hundred acre tract known as the Catlin tract. At the time the defendant company was first organized this tract was owned by a company in which the Lincoln Trust Company and a Mr. Greenwood each had a one-half interest; the land having cost them in May, 1901, $850,000. Of this sum $285,000 had been paid or advanced by the Lincoln Trust Company and the balance of the purchase price was evidenced by note secured by mortgage on the Catlin tract. At this time the Catlin tract was caused to be conveyed to a third person, a clerk in the employ of the trust company, who executed a further mortgage in the sum of $1,000,000 and then transferred the tract to the defendant company subject to the total mortgage indebtedness of $1,565,000, the consideration being stated in the deed as $2,400,000. It appears that Mr. Greenwood, acting for himself, and Mr. Woerhide, as president of the Trust Company, co-operated in organizing the defendant company. Of the $1,000,000 mortgage placed upon the Catlin tract one note of $300,000 was given to the Trust Company to repay it the amount it had invested in the tract and the additional $700,000 note was to pay the Trust Com-

pany for financing the first mortgage bonds, amounting
to $3,500,000 against all the company's property. The
first mortgage bonds were to be used in supplanting
original mortgages existing against the different tracts
of land which were transferred to defendant company
in payment of its stock. One million dollars par value
of common stock and $450,000 of the preferred stock
in defendant company was issued to said Greenwood.
The further plan was that the second mortgage bonds
amounting to $2,000,000 were authorized for the pur-
pose of raising funds to grade the property and carry
the investment until the property could be put in shape
and sold. To aid in selling the second mortgage bonds,
it was provided that $3,500,000 par value of the com-
mon stock was to be delivered as a bonus to future
purchasers of second mortgage bonds, giving three
and one-half shares of common stock as a bonus with
every $100 purchase of second mortgage bonds. A
million dollars' worth of the second mortgage bonds
were subscribed, mostly by residents of St. Louis. It
further appears in evidence that a syndicate agree-
ment was made whereby the subscribers of this second
mortgage bond issue should pool their common stock,
so received as a bonus, by delivering to the Trust Com-
pany three and one-half shares for each $100 of their
subscription, this stock to be voted at all meetings
by the board of managers of the syndicate. It was
provided by said syndicate agreement: "And the
members of said syndicate, and each of them, hereby
agree that the aforesaid common stock and every share
thereof shall remain pooled in the custody of 'Trust
Company, until the final dissolution of the company,
at which time the proceeds of the liquidation of said
stock shall be distributed by 'managers' or a majority
of them among the members of the syndicate, their
legal representatives or assigns according to *their re-
spective interests;*" and further provided that any
syndicate member could assign his *undivided interest*

in the syndicate stock or fund by proper indorsement upon, and the surrender of, the certificate evidencing his interest, and that thereupon the Trust Company would issue a new certificate in lieu thereof. There was some evidence that some of the men instrumental in organizing the defendant company were solvent and there was some evidence tending to show that one or two solvent persons, familiar with the company's organization, each subscribed for $25,000 of the second mortgage bonds and that thereby they each became the owner of approximately $87,500 par value of the common stock as a bonus.

Instructions three, five and six given by the court at the request of plaintiffs and relating to the issues upon this appeal were as follows:

"3. The court instructs the jury that the plaintiffs in the third count of the petition are here suing the defendant for an amount, with interest, alleged by plaintiffs to be due them by defendant on account of an alleged balance of 506 feet of average overhaul (out of a total claimed average overhaul of 766 feet) of 2,053,595 cubic yards of earth at three-fourths of a cent per cubic yard for each hundred feet of such overhaul, arising out of the grading of defendant's property by plaintiffs; and the court instructs you that if you believe from the evidence that in hauling the earth here in question the plaintiffs did the work under the supervision and subject to the direction and control and to the satisfaction of defendant's engineer in charge and supervision thereof and that the said engineer knew of the manner in which and the routes along which plaintiffs hauled the excavated earth in question and made no objection thereto, and that the said engineer assisted plaintiffs in the location of the routes along which said earth was hauled, then plaintiffs were entitled to receive compensation based upon the said manner and routes that said earth was so moved, and

you will find in favor of the plaintiffs on said third count for the amount, if any, remaining due them for the reasonable value of the work done as shown by the evidence, and including the said average overhaul in excess of 1400 feet, not exceeding, however, for the said average overhaul the rate of three-fourths of a cent per cubic yard of earth hauled for every 100 feet of average haul in excess of 1400 feet, together with interest thereon at the rate of six per cent per annum from April 19, 1904, the date of filing this suit, even though the jury may believe from the evidence that plaintiffs made a settlement of said claim with the defendant, providing the jury further find from the evidence and under other instructions given you that said settlement is not binding on plaintiffs.

"5. The court instructs the jury that even if they find from the evidence that a settlement was made between plaintiff and defendant when it paid plaintiffs the sum of $76,497.70, yet if the jury further believe from the evidence that prior to such payment the defendant admitted that said sum was due plaintiffs, and that defendant's president in substance told one of plaintiffs that it would suit him just as well for plaintiffs to sue defendant because it would have to borrow the money to pay with and that if it was sued that would put off the final payment two or three years, and that by that time defendant might have sold its property and have money to pay plaintiffs off with, or defendant might be busted and a judgment would not hurt it, and if the jury further believe from the evidence that thereupon plaintiffs made investigations as to the financial condition of defendant and ascertained facts sufficient to justify an ordinarily prudent person in believing that there was a reasonable prospect of defendant becoming insolvent and that plaintiffs were induced by the foregoing facts, if you so find the facts to be, to sign the receipt read in evidence, then

255 Mo. 7

said settlement is not binding on plaintiffs and the jury must not find against plaintiffs on account thereof.

"6.  The court instructs the jury that even if they believe from the evidence that there was a settlement of plaintiffs claim between plaintiffs and defendant, yet if the jury further believe from the evidence that in discussions preliminary to said settlement the defendant's president told one of plaintiffs that it would suit him just as well for plaintiffs to sue defendant, because it would have to borrow the money to pay with, and that if it was sued that would put off the final payment two or three years and that by that time defendant might have sold its property and have money to pay plaintiffs off with, or defendant might be busted and a judgment would not hurt it, and if the jury further believe from the evidence that defendant's capital stock had been paid up with property put in at an amount far in excess of its value, and that because of that fact there were large sums due from solvent stockholders on account of their stock and sufficient to pay plaintiffs' claim and that that fact was known to defendant's president when he made the foregoing statement and was concealed by him from plaintiffs, and was not known to plaintiffs, and that the foregoing statement of defendant's president induced plaintiffs to make said settlement with defendant, then such settlement is not binding on plaintiffs and the jury must not find against plaintiffs on account thereof."

The following instructions were among others given at the request of the defendant.

"8.  You are instructed that with reference to the amount of earth hauled under the contracts mentioned in the evidence, there is no dispute between the parties, the amount of same being 2,053,595 cubic yards.

"9.  If you find and believe from the evidence that on and prior to the first day of February, 1904, the plaintiffs were asserting a claim against the defendant for an amount alleged to be due them under the

contracts referred to in the evidence in excess of the amount of $76,497.70, and that the defendant in good faith was disputing said claim, and that on the first day of February, 1904, the defendant tendered plaintiffs the sum of $76,497.70, with the understanding and on the condition that plaintiffs accept said sum in full settlement and satisfaction of all claims against said defendant, growing out of the contracts mentioned in the evidence, and that the plaintiffs under such condition and with such understanding, did accept said sum, and execute a receipt in full of all their claims, contractual or otherwise, including all their claims for work done under said contracts, then your verdict must be for the defendant on the first and third counts of plaintiffs' petition, unless you further find and believe from the evidence that the defendant knowingly and with intent to deceive and coerce the plaintiffs into accepting said settlement, made false and fraudulent representations to plaintiffs concerning the ability of the plaintiffs to collect any judgment they might secure against defendant for a larger amount, as set out in other instructions, and that the plaintiffs had a right to, and did, believe and rely upon said representations and entered into said settlement in reliance thereon.

"10.  In determining, under the other instructions of the court, whether defendant was guilty of such false and fraudulent representations and concealments as to justify your finding and believing the plaintiffs' receipt of February 1, 1904, mentioned in the evidence, to be of no force and effect on that account, you are to take into consideration the knowledge, if any, of the plaintiffs, or either of them, or of John Scott, their father, now deceased, at and before the time of the execution of said receipt of February 1, 1904, of the facts and circumstances concerning or connected with the contracts mentioned in the evidence, and the grading thereunder and with the method by which the engineer in said contracts measured the overhaul, and with the

information and data used in measuring the same, and with the custom prevailing (if you find from the evidence that there was such a custom) in and about the city of St. Louis as to estimating the haul under grading contracts for subdivision work; and you are to take into consideration the manner in which, and the routes over which the plaintiffs transported the earth hauled under said contracts; and you are to take into consideration the contentions, if any, which you may find and believe existed between the parties, and the several claims, if any, made by each of the parties; and you are to take into consideration the knowledge which the plaintiffs, or either of them, or their father, had, if any, at the time they executed their receipt of February 1, 1904, concerning the assets and liabilities of the defendant and of its financial condition, and its prospective or inability to meet any judgment secured by plaintiffs, or concerning the plan under and manner in which the defendant was organized and its capital stock issued, and the manner in which its capital stock was paid up; and you will also take into consideration the means of knowledge, if any, which were available to plaintiffs, and their father, or either of them, to determine the facts upon which they base their charge of fraud and concealment; and you will take into consideration all other facts, circumstances and conditions at the time tending to explain the situation of the parties, or which may have any bearing upon your determination whether such fraudulent representations or concealments existed, as defined in other instructions of the court.

"11. The court instructs you that in determining, under the other instructions of the court, whether the defendant was guilty of such false and fraudulent representations and concealments as to justify your finding and believing they are not bound by the receipt of February 1, 1904, in evidence for that reason; you are

to take into consideration the knowledge, if any, which the plaintiffs and their father, or any one of them, may have had concerning the assets and liabilities of defendant, or its financial condition or of its ability or inability to meet any judgment secured by plaintiffs, or concerning the plan under and the manner in which the defendant corporation was organized, and its capital stock issued, and the manner in which its capital stock was paid up; and you are also to take into consideration not only the knowledge of the plaintiffs, and their father, or either of them, but also the means of knowledge available to them, if any."

The following instruction was requested by defendant and was given by the court after modifying the same by omitting therefrom the portion enclosed in brackets:

"12. The court instructs you that, under the laws of the State of Missouri, even though you may find and believe from the evidence that the incorporators of the Parkview Realty & Improvement Company stated in the articles of incorporation that the capital stock of the company had been subscribed and fully paid up in lawful money of the United States, or in cash, nevertheless, under the law of Missouri this means lawful money or its equivalent [and this statement by the incorporators of said company was a statement made to the Secretary of Missouri for the purpose of obtaining a charter for the company, and was not such a statement upon which the plaintiffs had a right to rely]. And you are further instructed that, under the laws of Missouri, the plaintiffs could not look to the incorporators for the payment of any judgment they might secure against defendant, except to the individual incorporators or subscribers to the capital stock—in the several amounts in which their several subscriptions to the capital stock might be found to be unpaid."

I. Appellant assigns as error the refusal of the court to give defendant's peremptory instruction to find for defendant on the third count of the petition.

In support of this contention it is urged: (1) That under a proper interpretation of the grading contract sued upon the final estimate and certificate of the engineer was binding on the parties; (2) that the respondents by acting upon the final estimate and accepting the amount thereof in full of all claims, gave to the final settlement the force and effect of an account stated; (3) that the evidence shows a completed settlement, accord and satisfaction.

*Second Appeal: Controlled by Law of First.*

We have carefully read the evidence introduced upon this, as well as upon the former trial, and in so far as it affects the above issues the evidence was in effect substantially the same upon both trials. Upon the former appeal these same propositions were urged by appellant (respondent then) in support of its contention that plaintiffs' nonsuit as to the first and third count of the petition should not be set aside. The authorities now cited by appellant in its brief in support of the above contentions were (with one or two unimportant exceptions) cited by it upon the former appeal in support of the same contention then made and the Court in Banc, after a careful consideration of all the above propositions, reached a conclusion contrary to appellant's contentions. We have carefully considered the former opinion (Scott v. Parkview Realty & Improvement Company, 241 Mo. 112), and are unable to discover wherein the conclusions therein reached are incorrect. Under such conditions, the law as declared upon the first appeal is controlling upon this appeal. [Bagnell v. Railroad, 242 Mo. 11, and cases therein cited.]

II. It is further contended that the court erred in giving plaintiffs' instructions three, five and six.

No authorities are cited in support of this contention, but many criticisms are directed against said instructions, the most important criticisms being substantially that: (1) They contain improper assumptions of fact and assume controverted facts to be true; (2) there was not sufficient evidence upon which to base them; (3) they contain improper comments on the evidence; (4) they are misleading and are incomplete in declaring the law applicable to the issues. We are unable to agree with appellant's contention in this regard. The instructions are in harmony with the law declared in the former opinion in this case, and there was sufficient evidence upon which to base them.

*Instructions: Overhaul: Prior Settlement.*

III.   Appellant contends that the court erred in instructing the jury to find for plaintiffs on defendant's counterclaim for liquidated damages.

The last modification of the contract extending the time in which the work was to be completed to October 1, 1903, did not contain a clause reiterating the obligation as to liquidated damages as was done in the first modification. The first modification contained such a provision, clearly showing that at least the parties thought that in order to have the clause as to liquidated damages remain in force after the first extension it was necessary to expressly so declare in the modification made. When this is taken into consideration with the fact that the last modification provided that the maximum amount of yardage which the defendant company could demand that plaintiffs do under the contract was increased by 150,000 cubic yards and "that if portions of the land *to be* graded *should be required for actual use or disposition prior to said November 1st,* the said John Scott & Sons agreeing, nevertheless, will upon written notice from the engineer in charge complete

*Contracts: Liquidated Damages: Abrogated by Modification.*

all work to be done upon such portion or portions without delay and within such reasonable time as shall be determined by such engineer,'' and further provided that the defendant company was given the right to allow other persons to haul dirt from outside the tract onto the tract, it clearly appears that it was not the intention of the contracting parties to have the obligation as to liquidated damages apply to delay occurring after October 1, 1903. Under such circumstances, the provision as to liquidated damages was abrogated by the force and effect of the last modification made. It therefore follows that the court did not err in giving said instruction.

It is further contended by appellant that even though it should be determined that the trial court did not err in failing to submit to the jury the question of its claim for liquidated damages, yet the court erred in failing to submit to the jury the question of unliquidated damages which it claims it suffered by reason of not having the contract completed by October 1, 1903. As to this contention, it is sufficient to say that appellant made no request for such an instruction and the motion for new trial does not complain of error based upon any refusal to so instruct.

**Instruction not Requested.**

IV. It is contended that the court erred in admitting in evidence the deed from McCauley showing the conveyance of the ''Catlin tract'' to the defendant company. At the time the deed was offered in evidence appellant simply objected without assigning any reason why said deed should be excluded and does not now cite any authority or suggest any reason why the admission of the same was error. The admission of said deed was proper at least to show that the Catlin tract was in fact conveyed to the defendant company. There was other evidence tending to show that the stock of the company was paid by the transfer of real estate to the

**Evidence: Deed.**

company and that the Catlin tract was a part of the property so conveyed.

Neither did the court err in modifying defendant's instruction No. 12, this without regard to the soundness or unsoundness of the law attempted to be declared in the portion omitted from said instruction, but for the reason that there was no evidence introduced tending to show that plaintiffs had any knowledge concerning the statements contained in the articles of agreement of the defendant company or that they had relied upon the statements therein made.

*Instructions to be Based on Evidence.*

It is urged that the verdict is excessive. In support of this contention appellant insists that the undisputed testimony shows that the reasonable value of the overhaul in controversy was only one-tenth or one-sixth of three-fourths of one cent for every one hundred feet of overhaul per cubic yard. We recall that one witness for defendant did testify that the cost of hauling dirt by tramway was one-tenth or one-sixth of what it was when hauled by wagon and team. But there was sufficient evidence to sustain the amount of the verdict. The amount stated in the contract, e. g., three-fourths of one cent per cubic yard for each one hundred feet of overhaul was prima-facie evidence that that was the reasonable value of such work. [Rude v. Mitchell, 97 Mo. 365; Deardorff v. Everhartt, 74 Mo. 37; Redman v. Adams, 165 Mo. 60; Monarch Metal Weather-Strip Co. v. Hanick, 155 S. W. 858.] Furthermore, upon cross-examination, Mr. Pitzman, one of defendant's witnesses, stated that the reasonable value of the work was higher than the contract price. The judgment is affirmed. *Roy, C.,* concurs.

*Quantum Meruit: Contract Price Prima-Facie Evidence of Reasonable Value.*

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.