THE STATE EX REL. EDNA MAE BROWN v. FRANCIS H. TRIMBLE ET AL., Judges of Kansas City Court of Appeals.—23 S. W. (2d) 162.

Division One, December 30, 1929.

*Virgil Yates* and *McAllister, Humphrey, Pew & Broaddus* for relator.

*Cowgill & Popham* for respondents.

RAGLAND, J.—Certiorari. Relator seeks to have quashed, on the ground of conflict of decision, the opinion and judgment of the Kansas City Court of Appeals in the case of Edna Mae Brown, respondent, v. Adams Transfer & Storage Company, a corporation, appellant, lately pending before that court on appeal from the Circuit Court of Jackson County. The opinion follows:

"This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $3,000, and defendant has appealed.

"Plaintiff was injured on December 2, 1925, while she, together with her aunt, mother and two small brothers, was riding in a five-passenger touring car driven by its owner, one Dunlap, a friend and boarder at the mother's house. Dunlap was driving his car westward on Independence Road, in Kansas City, about four o'clock P. M. of the day in question. About three blocks west of Sheffield in the eastern part of Kansas City, Independence Road passes through a subway under railroad tracks. While Dunlap was making the required left turn after his car had emerged from under the subway, a truck belonging to the defendant, traveling east on Independence Road and in the act of entering the subway, struck Dunlap's car near its left front door. The door and seat on the left side of Dunlap's car were smashed and damaged, but he drove away the car on its own power. Plaintiff was seated on the front seat at the right of the driver. The testimony in her behalf tends to show that she was thrown against the windshield and down and between the seat and dashboard of the car in which she was riding, and suffered the injuries of which she complains.

"The answer consists of a general denial and a plea of contributory negligence on the part of plaintiff and the driver of the car; it also pleaded the following release:

" 'Release.

" 'Know All Men by These Presents:

" 'That we, Edna Brown, May Brown, Katherine Gerish and E. W. Dunlap, for the sole consideration of eighty-five & no/100 dollars, to us in hand paid by The Adams Transfer Company, have released and discharged, and by these presents do forever, their heirs, executors, administrators and assigns, release and forever discharge the same Adams Transfer Company of and from all claims, demands, damages, actions, or causes of action on account of personal injuries and property damage to us sustained on or about December 2, 1925, caused by collision with one of the trucks of the

Adams Transfer Company and car in which we were riding which was owned and driven by the said E. W. Dunlap in the city of Kansas City, Missouri, and of and from all claims or demands whatsoever at law or in equity, which we, or our heirs, executors, administrators, or assigns can, shall or may have by reason of any matter, cause or thing whatsoever prior to the date hereof.

"'In witness whereof, we have hereunto set our hands at Kansas City, Missouri, this 7th day of December, 1925.

"'In the Presence of

"'R. W. CURRAN.

"'MISS EDNA BROWN,
MAY BROWN,
KATHERINE GERRISH,
E. W. DUNLAP.'

"Defendant further alleges that upon the execution of said release and full acquittance of defendant, an additional and further release in the nature of a draft covering said consideration was accepted and indorsed and cashed by plaintiff, same reading and being as follows:

"'At sight pay to the order of Edna Brown, May Brown, Katherine Gerrish and E. W. Dunlap, Eighty-five Dollars.

"'R. W. CURRAN.

"'Payable through Fidelity National Bank and Trust Company, Kansas City, Mo.

"'In final and full settlement of all claims, against Adams Transfer Co. resulting from auto collision on or about December 2, 1925.'

"Defendant alleges that by reason of the execution of the aforesaid releases and the full and final compromise and settlement of her claims so made by her with defendant, she is without right to maintain this action and defendant pleads said settlement and releases as a bar to the alleged cause of action herein.

"The reply consists of a general denial of new matters set up in its answer; that the agents of the insurance company, which carried liability insurance on defendant's truck, settled with Dunlap for the damages to his car and informed plaintiff that before Dunlap could be paid such damages it was necessary for her to come to the office of the insurance company with Dunlap and sign papers for Dunlap as a witness; that plaintiff went to said office of the insurance company and the agent of the company induced her ' . . . to sign said purported release and draft set up in defendant's answer, by falsely and fraudulently representing to her that the same related solely to the damage to said Dunlap's car; that she did not bind herself in any way or relinquish any of her rights; that plaintiff thought and understood from said in-

surance agent's reading of the papers and his statements and representations in reference thereto that she was signing as a witness to the receipt of the money to be paid to said Dunlap; that plaintiff relied upon the statements and representations of said insurance agent as to the contents and nature of the papers she signed; that she is ignorant and illiterate and of no business experience whatever; that said agent well knew that no part of said money was to go to plaintiff and that in truth and in fact no portion of the same was received by her; that it was to be paid to Dunlap for the damages done to his car; that in so far as this plaintiff is concerned, said purported releases were without consideration and void and of no effect.'

"Plaintiff testified that Dunlap took her, her aunt and mother to the office of the insurance company, explaining to them that it was necessary for her to sign papers as a witness in order for him to get pay for damages to his car; that all of them went into the office and found there two men representing the company; that Dunlap and the two men told the ladies that they desired them to sign as witnesses some papers that the two men had there; that they said that this was a settlement or a release of Mr. Dunlap to the company for damages to his car; that—

" 'Q. Did he read these papers to you? A. He read—he pretended to. Any way he had the papers in front of him.

" 'Q. All right, go ahead. A. He said, "These papers—this paper is what I want you to sign for this property damage. You want to sign a release for Mr. Dunlap's car, and this is what this is for. You just put your signature down."

" 'Q. *He mentioned Mr. Dunlap's name in reading this, did he?* A. *Yes.*

" 'Q. *Did he mention Mr. Dunlap's property damage in reading it to you, the damage to the car?* A. *You mean how much he got?*

" 'Q. *Yes.* A. *No, he did not.*

" 'Q. He did refer to property damage? A. Yes, sir.

" 'Q. Did he at any time mention your name in reading this release? A. He did not.

" 'Q. Did he at any time mention your mother's name in reading this release? A. No, sir.

" 'Q. Did he at any time mention your aunt's, Mrs. Gerrish's, name in reading this release? A. No, sir.'

"She further testified that this agent of the insurance company did not ask her, or any of the ladies, as to in what manner they were injured or how much they desired in settlement of their claims when they signed the papers. Plaintiff was then asked—

" 'Q. I will ask you if you relied on what this man read and told you about this matter when you signed this paper? Did you believe what he *told* you? A. Yes, sir.

" 'Q. If you had known that you were° signing away any of your rights—signing away any of your rights in what occurred out there, would you have signed that paper? A. No, sir.'

"She further testified that she had never received 'one penny' from defendant or the insurance company in settlement of her claim. On cross-examination plaintiff testified as follows:

" 'Q. Now, your testimony here, as I understood you, before lunch, was that Mr. Morse started to read this over, or you had him read it to you? A. He never read it.

" 'Q. Well, did you have anybody read it? A. No, sir.

" 'Q. Did you ask anybody to read it? A. No, sir.

" 'Q. Did you attempt to read it over yourself? A. Why, no, sir.

" 'Q. The reason you didn't read it or have him read it or ask anybody to read it, and the reason he' didn't read it, was because you wanted to help Mr. Dunlap and wanted to sign it up? A. No. sir. It was for the car. It was a release for the car. That is what I understood it to be and that is what I signed.

" 'Q. Didn't you sign to help Mr. Dunlap? A. Yes.

" 'Q. Is that the reason you signed without reading it? A. Yes.

" 'Q. Is that the reason you didn't have Mr. Morse read it' to you? A. *Do you mean that the reason I didn't have Mr. Morse read that* was I wanted to help Mr. Dunlap?

" 'Q. Yes. A. Well, I understood and just *took his word* for it, that it was a release for the car.

" 'Q. You took whose word? A. Mr. Dunlap and the insurance man.

" 'Q. You mean Mr. Morse? A. I suppose so, I don't know his name.

" 'Q. Are you claiming now Mr. Morse read that over to you? A. He had a paper in his hand and said it was a release for Mr. Dunlap's car.

" 'Q. Do you claim Mr. Morse read it over to you? ·A. He never read it over.

" 'Q. He did not? A. He did not.

" 'Q. I thought you said he held it up and read it? A. *He never read all of it.*

" 'Q. Did he hold it up and read it at all? A. Yes, sir.'

"Plaintiff also testified that her signature upon the draft was a forgery.

"Plaintiff's mother testified that the witness' signature on the draft was a forgery, but that she signed the release as a witness for Dunlap. The draft and·receipt were introduced in evidence and they purported to be indorsed and signed by plaintiff, her aunt, her mother and Dunlap. Plaintiff's mother testified that the ladies

were asked to sign the papers on representation that it was Mr. Dunlap's release. She testified that she was asked by one of the men representing the insurance company—

" 'Q. Did he read any paper there? A. He read just the one that we was there for release and was witnesses of the car of Mr. Dunlap.

" 'Q. Did he read that from the paper? A. Yes, part of it.

" 'Q. Did he read anything about releasing any and all claims for personal injuries that you might have? A. No, sir.

" 'Q. Did he read anything about releasing any and all claims for personal injuries Miss Edna might have? A. No.

" 'Q. Did he read anything about releasing any and all claims for personal injuries Mrs. Gerrish might have? A. No, sir, he did not.'

"Plaintiff's aunt testified that the two agents for the insurance company asked the witness to sign the paper which they represented to be Dunlap's release. She was asked—

" 'Q. What else did they say about it? A. They said just sign that paper to give Mr. Dunlap release, before he could get it (the money).

" 'Q. Did they read the release to you? A. No, sir.

" 'Q. Did they read anything to you? A. Didn't read anything to me.'

"She likewise testified that the signature upon the draft and receipt was a forgery, but that she signed the release on the representation that it was Dunlap's release and none other. All of the foregoing were plaintiff's witnesses.

"Defendant's witness, Curran, testified that he negotiated the settlement of the case. His version of the transaction was that Dunlap—

" '. . . came into my office with the plaintiff in this case, Miss Brown, at that time, and her mother, and aunt. They came up there, all four of them, and came in my office and at that time we discussed for some time the figure of settlement. Finally I just simply told them I did not think there any was liability in the case, but just to dispose of the matter with them, I would pay them $85. It was accepted. They all discussed it, and told me there was nothing outside of the fright of the accident. The women did not claim to be injured. They all said they were shaken up and scared somewhat, but that was about all.

" 'Q. Then what did you do toward fixing this up? A. Well, I called a stenographer in and had a release drawn up. They took the release and debated over it some few minutes, and all signed it. I personally wrote out the draft. . . .

" 'Q. Your hand wrote out the draft in question? A. At the time I wrote the draft I explained fully that was in full settlement

of the case, and the draft was made payable to all of them. It was immaterial to me how they divided it. I know at that time I did not think the damage to the car amounted to any way near $85, or any figure like that. My idea about it was, it was nearer $25, but I was just making a cash settlement to take care of all claims.'

"He denied that he read a paper or pretended to read a paper at the time, but that Dunlap and the ladies 'read the releases themselves and discussed them among themselves. . . . I didn't think there was any liability in it and I made a lump sum offer for settlement and they could divide the money any way they wanted, and they all said they were satisfied . . . they claimed . . . they had been slightly shaken up and frightened.'

"Plaintiff testified that while she had received only a seventh-grade education, she was not illiterate or ignorant and had no trouble in reading, writing and conducting average business negotiations; that she had been employed as a comptometer sorter, the work of which consisted of 'tearing little slips of paper and numbers and putting them on file.'

"In Johnston v. Ins. Co., 93 Mo. App. 580, 591, the court said:

"'If a party is induced to sign a contract by fraud, he can avoid it for that reason. But it is clear that merely falsely representing to a man in possession of his faculties and able to read, that a writing embodies their verbal understanding is not the fraud the law means. If it was, then no written contract could stand against the assault of either party. He would only need to say that it did not contain the agreement; and not containing the agreement, it is fraudulent; and being fraudulent, it cannot be enforced. Thus a writing would be mere waste material and all stability of contract be at an end. When no relation of trust and confidence exists, the false paper is not a fraud in law, when the party to whom the representations are made can read and has the opportunity to do so. [2 Story's Eq. Sec. 199; Hawkins v. Hawkins, 50 Cal. 558.] "The common law affords to every one reasonable protection against fraud in dealing; but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information." [2 Kent's Com. 485.] A man will not be relieved for "voluntarily neglecting to use common sense and judgment if he has them." [Robinson v. Glass, 94 Ind. 211.] "The law regards the golden rule as being of a too severe and elevated character for practical application to the business affairs of men." [Cahn v. Reid, 18 Mo. App. 127, 128.]'

"See, also, Magee v. Verity, 97 Mo. App. 486; Crim v. Crim, 162 Mo. 544; Ely v. Sutton, 177 Mo. App. 546; O'Shea v. Lehr, 182 Mo. App. 676, 691.

"In Hall v. K. C. So. Ry. Co., 209 S. W. 582, this court said,

" 'The general rule is that parties to written contracts are not permitted to go behind the writing. This rule, however, does not obtain where one of the parties while acting as an ordinarily careful and prudent man in his situation would act, nevertheless, is misled by some fraud of the other party. To make a case under the exception to the rule two things are indispensable: (1) Fraud in the procurement of the contract practiced by one party; (2) ordinary care and prudence exercised by the other.'

"See also Breeders Co. v. Wright, 134 Mo. App. 717, 721.

"We do not think that plaintiff has sustained the burden required in order to justify the court to set aside, on the ground of fraud, the release she signed, which purports to be a release of her claims as well as that of Dunlap. We are satisfied that she was guilty of negligence in not reading the release herself or in not having someone else read it for her. She states that the defendant's agent (who was a stranger to her) read a part of it, but does not say what part was read except that in reading the release the agent read the name of Dunlap. Instead of her evidence showing what else was read, she leaves the matter to guess or conjecture. Especially is this true in reference to her testimony as to the statement of the agent concerning the purpose of the release and the character in which she was signing. It is impossible to arrive at any conclusion as to whether he read or pretended to read from the paper or merely made oral statements as to what the paper contained. We think her testimony, if it means anything, shows that these were merely verbal statements of the agent explaining what the paper contained rather than a reading from the paper. We think that plaintiff wholly failed to sustain the burden upon her to show what is recognized in the law to be fraud in the procurement of a release. She not only testified that the paper was read only in part to her without explaining what part, but her evidence shows that she did not have the whole of the paper read. [Dyrssen v. Union Electric Light & Power Co., 295 S. W. 116, 117; Austin v. Brooklyn Cooperage Co., 285 S. W. 1015.] In her reply plaintiff admits that she signed the check and receipt, which constitute a release within themselves, but at the trial she testified without objection that her signature was a forgery. We have read the case of Tait v. Locke, 130 Mo. App. 273, and like cases cited by plaintiff, and find them not sustaining her. The Locke case was explained and distinguished in the Dyrssen case.

"From what we have said the court should have sustained defendant's demurrer to the evidence, and the judgment is reversed."

From the opinion it appears that the Court of Appeals, after setting forth the evidence of both plaintiff and defendant touching the question of fraud, proceeded, apparently as though the proceeding were one in equity, to weigh and consider plaintiff's evi-

dence, and then with respect thereto to rule: "We do not think that plaintiff has sustained the burden required *in order to justify the court* to set aside, on the ground of fraud, the release she signed . . . . We are satisfied she was guilty of negligence in not reading the release herself or in not having some one else read it for her . . . We think that plaintiff wholly failed to sustain the burden upon her to show what is recognized in the law to be fraud in the procurement of a release. She not only testified that the paper was read only in part to her without explaining what part, but her evidence shows that she did not have the whole of the paper read." From the last paragraph of the opinion we find that the court was ruling on a demurrer to the evidence—evidence which had been offered on an issue of fact triable to a jury.

The facts shown by plaintiff's evidence, and the reasonable inferences to which they give rise, constitute a simple story. On December 2, 1925, relator (plaintiff in the proceeding under review), her mother and her aunt were invited by one Dunlap, a boarder in her mother's home and a friend, to take a ride with him in his automobile. While riding pursuant to such invitation, as Dunlap's guests, a collision occurred between the automobile and a truck driven by an employee of a transfer and storage company, in which plaintiff suffered minor personal injuries and Dunlap's car was damaged. A few days later Dunlap requested relator, her mother and her aunt to accompany him to the office of a liability insurance company, saying that it was necessary for them to sign a paper *as witnesses*, "in order for him to get pay for damages to his car." When they arrived at the insurance office the adjuster said to relator, her mother and her aunt: we are settling with Mr. Dunlap for the damage to his car, and he is giving us a release; we want you to sign the paper as witnesses; sign here. And each of them affixed her signature as directed. The adjuster said not a word about the paper purporting to be also a release of any claim which the relator or either of the other two women might have. Relator believed the statement that the paper was just a release that Dunlap was giving upon a settlement for the damage to his car. As she was not a party to it, and as it in no way affected her interests, she was not concerned about its contents: consequently she did not read it or ask any one else to read it for her. Relator's schooling ended when she completed the seventh grade, she could read and write and she had enough education to negotiate ordinary business transactions; but she was not familiar with the practices followed and the methods employed by adjusters of liability insurance companies in disposing of claims.

A reading of the opinion as a whole discloses beyond peradventure that the Court of Appeals in ruling the demurrer violated a rule established by innumerable decisions of this court, namely,

"that, upon a demurrer to the evidence, the testimony offered in support of the issues tendered by the pleadings must be taken as true, together with every reasonable inference which may legitimately be drawn therefrom." For application of this rule in a proceeding of this kind see State ex rel. Gordon v. Trimble, 318 Mo. 341, 347, et seq., 300 S. W. 475. If the Court of Appeals had followed the rule just referred to it would not have closed its eyes to the fact that the false representations and fraudulent concealments on the part of the insurance adjuster, acting for the transfer and storage company, operated to keep relator from reading or having read to her the paper to which she affixed her signature, because such fact is plainly inferable from the facts expressly testified to.

In applying the doctrine of negligence without qualification, the facts considered, the Court of Appeals contravened a number of decisions of this court. When all the attendant circumstances are considered, together with relator's capacity and experience, there is little doubt but that the false representations and fraudulent concealments on the part of the insurance adjuster were designed to induce, and did induce, relator to sign the release paper without further investigation as to its character or contents. At least such a finding by the jury would have ample support in the evidence. And on that hypothesis of fact relator's alleged negligence, as affecting the right to the relief she asked, was of no consequence whatever. The effect of negligence on the part of the party deceived may be tolled by the active fraud of the other party. Such in substance was the holding of this court in Rau v. Robertson, 260 S. W. 751, 755. For a further exposition of the principles involved, as declared by the decisions of this court, see State ex rel. Union Pacific Railroad Company v. Ewing C. Bland et al., 324 Mo. 601, 23 S. W. (2d) 1029, decided at this term.

Because of the conflict noted the opinion and judgment of the Court of Appeals are quashed. All concur.