HAROLD POE v. ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation, Appellant.—99 S. W. (2d) 82.

Division Two, November 17, 1936.

1026

*Watts & Gentry* for appellant; *E. C. Craig* and *Charles A. Helsell* of counsel.

*Louis E. Miller* and *Charles A. Lich* for respondent; *William C. McLaughlin* of counsel.

BOHLING, C.—Action under the Federal Employers' Liability Act. On the former appeal [Poe v. Illinois Central Railroad Co., 335 Mo. 507, 73 S. W. (2d) 779], judgment for plaintiff was reversed and the cause remanded because the evidence was insufficient to establish negligence on the part of defendant. Upon retrial, plaintiff prevailed; but the court *nisi* granted a new trial on the ground the verdict was against the weight of the evidence. A third trial resulted in a verdict for plaintiff in the sum of $20,000; and upon plaintiff entering a forced *remittitur* of $10,000, judgment was rendered for $10,000. Defendant appeals.

Before reaching the merits of plaintiff's cause of action, we are confronted with defendant's plea in bar.

Plaintiff was injured on December 18, 1928. On February 1, 1930,

plaintiff was paid $850 and executed a release to defendant, which defendant pleaded in bar to plaintiff's action. Plaintiff's reply charged said release had been obtained through fraud practiced upon plaintiff by defendant's claim agent Mr. Purkhiser. If the release is valid, plaintiff's cause of action must fail. Defendant contends the evidence adduced did not make a submissible case of actionable fraud on the part of defendant in the procurement of the release in that (1) the misrepresentations attributed by plaintiff to defendant's agent, standing alone, are insufficient in law to constitute a fraud upon plaintiff and (2) plaintiff's testimony that he could not read, upon which he relies to justify his failure to inform himself of the contents of the writing, stands so thoroughly impeached in the record as to be of no probative value and constitutes no substantial evidence of the fact.

■ As a preliminary controversy to a reconsideration of said issue, as well as others, on this appeal, plaintiff takes the position that since the pleadings present no new issues and the evidence on retrial is substantially the same, the rulings of this court on the former appeal are the law of the case. [State of Kansas ex rel. v. United States F. & G. Co., 328 Mo. 295, 299, 40 S. W. (2d) 1050, 1052(1); Coleman v. Northwestern Mut. L. Ins. Co. (Mo.), 233 S. W. 187, 188(1); Scott v. Parkview R. & I. Co., 255 Mo. 76, 102(1), 164 S. W. 532, 540(1).] Plaintiff's statement as far as it goes is correct, but, quoting Davidson v. St. Louis-S. F. Ry. Co., 301 Mo. 79, 85, 256 S. W. 169, 170: "It should be further stated, however, that even if there is no substantial difference in pleadings and proof upon the retrial, yet if this court upon second appeal finds that it was in error upon the first hearing, it not only has the power and right to correct such error, but it would be the duty of the court so to do, in the interest of justice. This is true whether we erred in the principles of law declared, or erred in the determination of what were the real facts of the case." Mangold v. Bacon, 237 Mo. 496, 512(a), 525, 141 S. W. 650, 653(4, 5), 658, was a banc case having under consideration a banc opinion upon former appeal. It contains a review of the authorities; states the general rule, grounded on convenience, experience and reason, that legal conclusions announced on a first appeal become and remain law of the case, is subject to exceptions as well recognized as the rule itself, and sums up the matter thus (237 Mo. l. c. 517): "Whether from grace or right when cogent and convincing reasons appear, such as lack of harmony with other decisions and where no injustice or hardship would flow from a change, or where by inadvertence principles of law have been incorrectly declared the first time, or mistake of fact has been made, or injustice to the rights of parties would be done by adhering to the first opinion, then the exceptions to the rule have play and it is our duty to re-examine and

correct our own errors on the second appeal in the same case." [See also: Davidson v. St. Louis-S. F. Ry. Co., 301 Mo. 79, 85(I), 256 S. W. 169, 170(2); Hogan v. Kansas City, 322 Mo. 1103, 1111(I, a), 19 S. W. (2d) 707, 711(2); Crossno v. Terminal Railroad Assn., 333 Mo. 733, 739, 62 S. W. (2d) 1092, 1094(4); State ex rel. v. Sturgis, 281 Mo. 598, 606(4), 221 S. W. 91, 94(6); Murphy v. Barron, 286 Mo. 390, 400(1), 228 S. W. 492, 494(1).] The instant record discloses some additional evidence. Of greater import, the ruling on former appeal relies on divisional opinions (now relied on by plaintiff and hereinafter discussed) in holding plaintiff made a submissible case on the tendered issue of fraud; whereas, defendant now strenuously presses upon our attention an opinion of the court en banc [Conklin v. Missouri Pac. Railroad Co., infra] subsequent to said divisional opinions, which was omitted from defendant's original brief on the former appeal. Being the latest decision of this court en banc, it is the controlling decision on the issues there authoritatively determined in announcing the legal conclusions necessary to the decision rendered and is binding on the divisions of this court as well as all other Missouri State courts [State ex rel. v. Daues, 319 Mo. 733, 740, 6 S. W. (2d) 893, 896(1), and cases cited; State ex rel. v. Shain, 334 Mo. 617, 620(2), 66 S. W. (2d) 826, 827(2)]. As the Conklin case bears upon the issue under consideration, this appeal falls within the exceptions to the general rule and we proceed with our reconsideration.

■ An accurate detailed statement of plaintiff's testimony covering the transactions culminating in the execution of the release is somewhat difficult due to some variations therein. Plaintiff testified he first met Purkhiser in Chicago pursuant to arrangements made over long distance telephone. After stating the first time he talked with anybody about the possibility of a settlement was with Purkhiser in Chicago, plaintiff stated he thought Purkhiser did not say anything at that time about settling his claim. Plaintiff admitted he may have testified at the first trial (he did not remember it if he did) that Purkhiser had offered $200 to $300 to settle the case; that he understood settling the case meant he would never have any more claim; and that he was not ready to settle. Plaintiff next met Purkhiser at Fulton, Kentucky; "and he asked me was I ready to settle the case, and I told him, 'No.' . . . I didn't understand that he was talking about making a final settlement of my case; he asked me if I was ready to settle my case, and I told him 'no, my leg wasn't well.' I insisted that I wanted to wait until my leg got well before I made a settlement, that was my idea. I didn't know what the word 'settle' meant." Sometime thereafter ("three or four days or a week" or "some weeks or months") plaintiff, having secured from Purkhiser a pass to East St. Louis to visit around and see Mr. Bishop, his former foreman, was met on the train by Purkhiser just before

it reached East St. Louis; and Purkhiser said "Poe, we will get off at the Division office." They did this and plaintiff went in and talked to Mr. Bishop. Mr. Bishop left the room and then "Purkhiser came in all swelled up and he said: 'Poe, what are you going to do?' and I said, 'What do you mean, Mr. Purkhiser?' and he said, 'I have got orders to settle this case or blow it up?' I asked him, 'What do you mean, Mr. Purkhiser?' and he said, 'I have got orders to settle this or cut you out of hospital service and throw you out of service.' I didn't exactly know then that when he said 'settle the case,' he meant a final settlement; I thought that was what he meant. I said, 'Mr. Purkhiser, I ain't able to settle with my leg, it is not well and I am still walking with a cane, I don't know when it will be well,' and he said, 'I don't mean settlement on your leg for good, I mean your wages up to date under the compensation, and when your leg gets well, we will settle on your leg.' *I didn't know what he meant by 'wages under the compensation.' I did not ask any explanation and I didn't tell him I didn't know what he meant. . . . It was on the 31st of January,* 1930. . . . When he said, 'Pay your wages under the compensation,' *I didn't ask him any questions as to what compensation meant."* Purkhiser and plaintiff made an appointment to meet the next morning in a lawyer's office and separated.

They met the following morning, and Purkhiser informed plaintiff his wages amounted to $850. "He just offered me $850, and I told him I would take it. He had some *printed* blanks." Defendant's Exhibit 13 is a release executed by plaintiff to defendant covering the cause of action in litigation. Defendant's Exhibit 14 is a draft for $850, payable to and endorsed by plaintiff. Each is on a printed form with the blanks appropriately filled in. They are dated February 1, 1930. Across the face of the release is printed "READ THIS RELEASE." Across the face of the draft appears: "In Full Settlement of Claim for injuries sustained E. St. Louis, Ill. 12-18-28;" "In Full Settlement of Claim for" being in print. Plaintiff testified he could not read the simplest words, such as "cat," "it," or "at," and was unable to recognize the letters "I. C.," although he testified, in one place, he had been in the fourth grade and, in another, in the third grade at school and had worked in the Illinois Central yards for months. While unable to read exhibits 13 and 14, he identified his signatures thereon and the papers as the papers involved in the transaction between him and Purkhiser. He further testified: "Before Mr. Purkhiser gave me the draft for $850 and before I signed my name to defendant's Exhibit 13, Purkhiser called in two men from another room to witness my signature. He started to read it to me before he went in the room after them and he says, 'O, well, it don't mean anything, but it is a receipt for your wages up to date and you will have to sign it before you go back to work.' He just started to read

it. He read about two or three words or something like that. . . .
I don't know just what he read. He didn't read much of anything.
He just picked up the paper and started to read it and he may not
have read none of it . . . I don't know how many words he read.
I couldn't recollect a single word.'' Upon plaintiff's request, one of
the witnesses to plaintiff's execution of the release accompanied plain-
tiff to a bank for the purpose of identifying plaintiff that he might
obtain some cash.

The release recites that the plaintiff had fully informed himself
of its contents. However, plaintiff testified: *"When I signed the re-
lease nobody read it to me at all. I did not ask anybody to read it to
me. I did not ask anybody to explain it to me, and nobody did ex-
plain it to me."* He admitted testifying at the first trial, referring
to the execution of the release: ''Q. What conversation occurred
between you and Mr. Purkhiser there? A. Well, we didn't talk
anything about it; he just got me to fill out some papers. Q.
About what? A. He told me to—pushed it around there and
told me to sign it, and that was my receipt, and I had to sign before
I could go to work. Q. Is that all he said? A. Yes, sir.''

Testimony on behalf of defendant was that plaintiff admittedly un-
derstood the effect of the release at the time he signed it.

We shall not detail the testimony concerning plaintiff's inability
or ability to read. Plaintiff testified he had forgotten every letter
of the alphabet; that he ''sorta'' drawed his name, sometimes spell-
ing it with one ''r'' and at others with two. He identified his signa-
ture on a number of exhibits. Said signatures read: ''Harold Poe,''
''Harry Poe,'' ''Harrel Poe'' and Harrel Po,'' and said exhibits
embraced acknowledgments of receipt of notices given employees by
defendant containing the statement that the party signing the same
had ''carefully read'' certain rules of defendant therein referred to,
and a four page statement, given in Chicago some time prior to the
execution of the release, of how he received his injury, plaintiff's
name being signed to each sheet and that the last sheet concluding: ''I
have read the above and foregoing statement and it is true and correct.
Harold Poe.'' Plaintiff testified, regarding the statement: ''I didn't
know for sure what I was signing. I did it because he [Mr. Sawin,
district claim agent] asked me to;'' that he didn't know what it was,
didn't ask what it was, and thought he was not told what it was; and
''I don't think I told them that I couldn't read.'' Defendant adduced
evidence from a schoolmate and a former teacher of plaintiff to the
effect plaintiff recited in reading, writing and other subjects while
at school; that plaintiff had been promoted from the fourth to the
fifth grade; and that there was nothing offered which a child could
study without being able to read.

To sustain his contention that there was substantial evidence

justifying the submission of the issue of fraud to the jury plaintiff relies on the Rau, Ensler, State ex rel. Brown, State ex rel. Union Pac. Railroad Co., and Laird cases, infra. Of the cases relied on by defendant, we shall mention only those deemed the more apropos.

A real estate transaction was involved in Laird v. Keithley (Mo.), 201 S. W. 1138. The fraud embraced, among other things, misrepresentations as to the cost price of the land, its productivity, and the price at which it was being offered on the market, as well as active concealment of certain disadvantages connected with the farm; matters peculiarly within the knowledge of defendant. The plaintiff was then living in another state, was not a trader, didn't know Missouri land and informed defendant he would be entirely dependent on what defendant told him. The case is clearly dissimilar to the instant case.

In Rau v. Robertson (Mo.), 260 S. W. 751, defendant's representation to plaintiff that a release was a mere receipt for four weeks' wages was held actionable notwithstanding plaintiff's failure to read or have read the release. Among the more salient facts of the case were defendant's arrangements for plaintiff's care, repeated visits, manifested sympathy and solicitude, assurances of friendship and against financial loss and unremitting attentions to plaintiff subsequent to the accident thereby ingratiating himself with plaintiff, plaintiff's physical condition—weak, sick and nervous—and impatience to leave the hospital to go home, defendants folding of the release so as to disclose merely the place for signature, his misrepresentations, and plaintiff's expressed confidence in defendant being a man of his word immediately prior to signing the release. Plaintiff also testified the room was too dark to permit of reading the release (a fact, if so, as readily apparent to defendant as to plaintiff), and that she was too sick to read.

In Dyrssen v. Union El. L. & P. Co., 317 Mo. 221, 227, 295 S. W. 116, 118, plaintiff contended he was induced to sign the release by virtue of his foreman's misreading it so as to convey the meaning it was a receipt for sick benefits. Plaintiff was a young man of good education and business experience, fully able to read and understand the meaning of the release, was laboring under no physical or mental handicap, knew his foreman was neither the secretary nor treasurer of the sick benefit association, and no confidential relation existed. In holding plaintiff failed to make a submissible case, the court said: "Numerous authorities in this State sustain the view that something more is required to render the question one of fact for the jury than the mere signing of a paper without reading it by one who is amply able to read and understand, *even though he relies on the other's statement concerning the contents or character of the instrument signed.*" (Italics ours.)

In State ex rel. Brown v. Trimble, 324 Mo. 353, 362, 23 S. W. (2d) 162, 166, plaintiff had been in an automobile wreck and was asked by the owner of the car to sign papers as a witness that he might receive pay for damage to his car. Evidence adduced on behalf of plaintiff to the effect defendant's agent stated he was settling the damages to the car and wanted plaintiff to sign the car owner's release as a witness, which, in fact, included a release by plaintiff, and that plaintiff's signature to the draft issued in settlement was a forgery was held sufficient to make the issue of fraud in the procurement of plaintiff's release one for a jury; the court stating: "As she [plaintiff] was not a party to it [the release], and as it in no way affected her interests, she was not concerned about its contents; consequently she did not read it or ask anyone else to read it for her."

In Higgins v. American Car Co., 324 Mo. 189, 194, 22 S. W. (2d) 1043, 1044, plaintiff was instructed to go to the insurance office and "they will settle your wages with you.". Plaintiff testified he could not see to read or sign his name without glasses, that defendant's agent said: " 'Here is my check for signing this paper,' and plaintiff asked him what it was and he replied: 'It ain't nothing; only just a receipt, merely a receipt to show I paid your wages from the time you were injured.' Plaintiff did not read the release nor have his wife read it, she being present. The check issued in payment stated on its face and its back it was a release. It was retained by plaintiff three or four days. The court said nothing was said to prevent plaintiff or his wife from reading the release or the check, and, although other factors entered, concludes: "He [plaintiff] was guilty of such negligence *throughout* those transactions that he cannot be heard now to say that he was deceived and induced by fraud to execute the release and endorse the check." (Italics ours.)

Ensler v. Missouri Pac. Railroad Co., 324 Mo. 530, 538, 23 S. W. (2d) 1034, 1037(4) states: "The fact that a false representation was made in respect to the paper is not necessarily sufficient to excuse plaintiff for affixing his signature thereto in ignorance of its contents, unless under *all the circumstances*, in view of his duty to give reasonable attention to the protection of his own interests, the false representation was reasonably calculated to, and did, induce him not to make the investigation which he would have otherwise made " (Italics ours.) Plaintiff testified defendant's agent posed as his friend, and they were negotiating on the basis of payment of plaintiff's wages until he was able to return to work and plaintiff's re-employment; that defendant would take care of plaintiff; that plaintiff told the agent he was "pretty near crazy with pain;" that his eyes were so he couldn't read, he could not figure and would have to leave the figuring to the agent; that the agent represented the release to be a receipt for wages being paid plaintiff under the oral understanding; that

1034

when directed to sign the release, plaintiff said "I can't see it," "I can't see where to sign it" and the agent showed plaintiff where to sign. The issue was held for the jury, although, giving consideration to all the circumstances including a subsequent letter from plaintiff, it strained the court's credulity to accept plaintiff's statement he was deceived.

In State ex rel. Union Pac. Railroad Co. v. Bland, 324 Mo. 601, 23 S. W. (2d) 1029, Yiokas had employed Ulman as his attorney and thereafter settled with relator. Ulman sued relator for his fee and relator set up fraud in procuring the attorney's contract. Ulman accompanied by Mitchell and Bahas, two Greeks, went to a hospital to see Yiokas, also a Greek, and secured the contract, the Greeks conversing in their native tongue while Ulman stood by. Yiokas was told to sign the paper and when he got out of the hospital he could give it to the company and settle and, if he got anything, he might give them something if he wanted to. Yiokas was not informed he was signing a contract, could not read English and did not ask that the paper be read or explained to him. Yiokas knew Bahas well, being fellow townsmen in Greece. The court considered Mitchell and Bahas agents of Ulman, although posing as friends of Yiokas, and, under the circumstances, the misrepresentations actionable. As we read the case the court considered Ulman, by calculation and artifice, had obtained the confidence of Yiokas through his agents Mitchell and Bahas.

In Brennecke v. Ganahl Lbr. Co., 329 Mo. 341, 44 S. W. (2d) 627, plaintiff's testimony was that he met one Nolan from an insurance company during the lunch hour at defendant's office and was told defendant had its employees insured for their wages; that Nolan figured plaintiff's loss of wages at $56.25; that plaintiff informed the agent he did not have much schooling and didn't know anything about papers; that plaintiff could not read without his glasses and asked to be permitted to get his glasses and was told he need not get them, that all he had to do was sign the papers and that the paper was "just a receipt, that's all." Plaintiff signed the release and was given a release-draft. Plaintiff's glasses were in a nearby locker, and his stepson was working at the plant. Plaintiff retained the draft, which had the release on the reverse side thereof, for four days before cashing it, having it at his home where members of his family, who could read, were available. Quoting from State ex rel. Missouri Pac. Railroad Co. v. Trimble, 332 Mo. 962, 964, 59 S. W. (2d) 622, 623: "In the Brennecke case the release was challenged on the ground that the claim agent represented to the employee that he was merely signing a receipt for his wages. We held that under the facts of that case the employee should have read the release before signing it. We further held that he had an opportunity to learn

the terms of settlement by reading the voucher which he retained for several days before cashing it.''

Hannah v. Butts, 330 Mo. 876, 883, 51 S. W. (2d) 4, 7, involved a full release which was alleged, among other things, to have been executed upon representations it was a receipt for a part payment of what was due plaintiff on account of his injuries and not a full settlement of plaintiff's claim. The court said: ''The making of the representations alleged, nothing further appearing, was not fraudulent. Merely telling one that a formal release which you desire him to execute is just a receipt is not calculated to deceive him. The presumption is that he can, and will, read the instrument for himself.''

This court en banc in Conklin v. Missouri Pac. Railroad Co., 331 Mo. 734, 738, 55 S. W. (2d) 306, 308, held a representation by a claim agent to plaintiff that the doctor had told the claim agent plaintiff would be well and out of the hospital in three or four months, upon which plaintiff relied and settled, did not constitute actionable fraud although the doctor had not so informed the claim agent, where plaintiff and his wife, who was present, did not but could have ascertained from the doctor, who daily visited plaintiff, if the claim agent's statement was true, and no fraudulent devices were practiced upon plaintiff to cause him to refrain from such inquiry. That case states, in dealing with releases, ''this court has in recent years gone a long way in its efforts to protect 'the foolishly credulous, as against the machinations of the designedly wicked,' as consonant with the administration of pure justice''—citing the Rau and State ex rel. Union Pac. Railroad Co. cases, supra, to which we add State ex rel. Brown, supra. The opinion, restating certain principles, while omitting an exception thereto, mentioned in the Ensler case, supra, continues: ''But we have never lost sight of the principle that the courts will not protect those who, with full opportunity to do so, will not protect themselves. Where the means of knowledge are at hand and are equally available to both parties, and the subject matter is alike open to their investigation, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentations.'' We mention that RAGLAND, J., was the author of the Conklin case and also wrote the Rau, State ex rel. Brown, Ensler and Hannah cases, supra; that State ex rel. Brown cites only the Rau and State ex rel. Union Pac. Railroad Co. cases, supra, on the issue, which two cases are cited in connection with the above first quoted comment in the Conklin case.

In State ex rel. Missouri Pac. Railroad Co. v. Trimble, 332 Mo. 962, 59 S. W. (2d) 622, defendant's doctor told plaintiff, upon inquiry, ''Why sure you are all right, make your settlement and go back to work,'' and defendant's claim agent thereafter told plaintiff he had talked to the doctor and the doctor told him he was all right. This

court held the ruling of the Court of Appeals that plaintiff made a submissible case on the issue of fraud was not in conflict with the Conklin, Brennecke and certain other cases which need not be mentioned.

In Alford v. Wabash Ry. Co., 73 S. W. (2d) 277, 280(4), the Kansas City Court of Appeals, in upholding a release which plaintiff was told "was a statement for my time," "a receipt or something for my time" and which releasor did not read on account of not having his glasses, said: "The law is well settled that one who is dealing at arm's length with another cannot rely upon what the latter may say to him regarding the contents of a proposed agreement but he must read the agreement for himself if he has the ability to do so and if he does not have such ability he must have it read to him by someone else, if available, upon whom he has the right to rely"— citing the Hannah and Brennecke cases, supra. An application for certiorari on the ground the ruling of the Court of Appeals was in conflict with the State ex rel. Mo. Pac. Railroad Co.; State ex rel. Union Pac. Railroad Co.; State ex rel. Brown; Rau and Ensler cases, supra, submitted by the litigants on suggestions going only to the merits of the application, was denied by this court en banc on October 13, 1934. [State ex rel. Alford v. Shain, No. 33804 on the docket.]

An analysis of the cases reveals that they turn on the nature of the transaction involved, the representations made by the representor, the relation existing between the parties—whether one of trust, or confidence, or friendship, or close acquaintance, or that of strangers dealing at arm's length—or the trick or artifice, if any, employed.

Plaintiff never met Purkhiser before the Chicago meeting. He testified Purkhiser was not his lawyer, doctor, preacher or anything of that sort, and he never attended to any business for plaintiff. No confidential relation, or relation of trust, or even friendship or close acquaintanceship existed. Throughout plaintiff was dealing with strangers at arm's length. He did not know what "wages under the compensation" meant, did not ask what it meant or request any explanation, and did not inform defendant's agent of his ignorance. The following morning he executed the release when Purkhiser "pushed it around there and told me to sign it" upon the statement that it didn't amount to anything, but was a receipt for his wages up to date. (The record discloses no legal obligation on defendant to pay plaintiff wages, and we are unable to ascertain the consideration supporting the contract testified to by plaintiff.) No one read the release to him, he did not ask anybody to read or explain it, and no one explained it to him. Notwithstanding plaintiff testified he was not able to read, a reading of his testimony, if we omit reference to the execution of the release, demonstrates he possessed at least if not more than ordinary business shrewdness. He was *sui juris*, was

not and had not been for some time, if ever, suffering from any physical or mental handicap which caused him to be incapable of managing his affairs. There is nothing in this record that would apprise defendant at the time plaintiff executed the release that plaintiff was unable to read. Plaintiff did not inform defendant's agents he could not read. Unadvised of plaintiff's inability to read defendant had the right to indulge in the presumption plaintiff could read. Further, from plaintiff's signed written applications for employment, daily time records, acknowledgments of notices given employees, some reciting the signer had carefully read certain rules of defendant, and the four page statement of how plaintiff received his injuries, stating he had read the same, the only legitimate inference was defendant had knowledge at the time of the execution of the release plaintiff could read. To permit plaintiff to set aside the written release on the fact basis he could not read when he concealed his inability to read and gave apparent assurances he could read would have a tendency to smack of a fraud on defendant. Originally, a proceeding to set aside a release on the ground of fraud was in equity, and while the statute [Sec. 782, R. S. 1929, Mo. Stat. Ann., p. 1036] blended the equity and legal jurisdiction of the courts on such issue, the rules of law governing the rescission of contracts were not affected.

■ Parties may contract without a writing. When the contract is reduced to writing, the writing expresses the final agreement, is presumed to merge all prior negotiations, becomes the highest evidence of the agreement, and possesses greater stability than a contract merely in parol. On the reliance of the stability of the writing, the parties alter their legal status. Fraud sounds in tort. The legal duty of the respective parties to a contract, depending of course on the circumstances attending the execution of the writing, to ascertain that the contents of the writing expresses their agreement is reciprocal. In the instant case Purkhiser's principal paid out its money under the written release in consideration for plaintiff's covenant of release. True, as stated on the first appeal, the law does not read the ignorant and unwary out of the pale of its protecting and remedial influence; but the practical administration of justice has rendered it expedient to set up certain standards, and the law, which every one is conclusively presumed to know although the courts themselves often experience considerable difficulty and labor in finally determining what the law of a given case is, recognizes established principles of conduct governing men in their commercial transactions. Absent fraud, accident or mistake, as stated by Judge Goode in Anderson v. Meyer Bros. Drug Co., 149 Mo. App. 554, 573, 130 S. W. 829, 835: "It is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by someone on whom he has a right to rely,

the circumstances considered, and provided either method of obtaining the information is available without too great inconvenience.'' [See also Crim v. Crim, 162 Mo. 544, 552, 63 S. W. 489, 490.] And as to the duty of one unable to read, see Yerxa, Andrews & Thurston, Inc. v. Viviano (Mo.), 44 S. W. (2d) 98, 99(1); the Brennecke and Alford cases, supra.

While the law affords every one reasonable protection against fraud, it does not go to the romantic length of establishing the relation of parent and child or guardian and ward between courts and adults capable of managing their affairs, in full possession of their faculties and unrestrained in action, and indemnify them when dealing at arm's length against the consequences of their own indolence, listless inattention or unwarranted credulity in the transaction of business affairs. Under the authority of the Dryssen, Higgins, Brennecke, Hannah and Alford cases (to the effect, as between parties dealing at arm's length, a representation that a release is merely a receipt is not, standing alone, actionable fraud) and the Conklin case (to the effect that the courts will not protect those, who with full opportunity to do so, will not protect themselves), supra, defendant's demurrer should have been sustained. The most casual glance at the printed portions of the release or release-draft by one able to read would have disclosed the contract was one of release and settlement; and the case appears to be within the observation in Judd v. Walker, 215 Mo. 312, 337, 114 S. W. 979, 980: ''If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury; and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort.''

The foregoing obviates the necessity of discussing the other issues raised, including any legal duty resting upon one unable to read to give attention to the business he is about and transacting.

The judgment is reversed. *Cooley, C., dubitante; Westhues, C.*, concurs.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.