ELIZABETH A. SCHUBERT, (Plaintiff) Respondent, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, (Defendant) Appellant.—No. 40790.—214. S. W. (2d) 420.

Division Two, October 11, 1948.

Motion for Rehearing or to Transfer to Banc Overruled, November 8, 1948.

*Fordyce, White, Mayne, Williams & Hartman* and *F. W. Schwarz* for appellant.

*Everett Hullverson* for respondent; *Orville Richardson* of counsel.

306

[420] ELLISON, J.—This cause was certified to this court from the St. Louis Court of Appeals under Art. V, Sec. 10, Const. Mo., 1945, on the opinion of one of the judges thereof dissenting from the majority opinion, and his certification that he deemed it in conflict with a prior decision of this court, to wit, Poe v. Ill. Cent. Ry. Co., 339 Mo. 1025, 99 S. W. (2d) 82.

The point of difference is whether the respondent is bound as a matter of law by a printed release which she admittedly signed, purportedly compromising and settling for $10 her claim against the appellant for personal injuries sustained while riding as a passenger on one of its busses in St. Louis. Thereafter she brought suit against appellant for damages for said injuries in the circuit court and recovered judgment for $4500. The appellant interposed said release as its main defense. The respondent denied that she read the release or signed it as a full settlement of her claim, and testified the $10 was paid to her to defray the expense of having X-ray pictures taken to ascertain her true condition. The trial court and the majority opinion of the Court of Appeals held she was not conclusively bound by the release and that the question was for the jury. The dissenting opinion held the contrary. The two opinions are reported in 206 S. W. (2d) 708 et seq., where they cover fifteen pages. References should be made thereto for a fuller statement of the facts. We condense them here, our statements in some instances being based on the transcript of the evidence.

The respondent was a widow 61 years old, and employed in the stock room of a department store where she was engaged in marking jewelry for $22 per week. There is no direct evidence as to her education or vision, but it was shown that she had had previous business experience with her husband running a hotel and restaurant in Union, Missouri, managing the help, paying bills, etc. The casualty occurred early in the morning as the bus had nearly reached [421] her place of work. It gave a violent jerk and her hip or back struck a seat. She complained to the bus operator and gave him her name and address, but said she didn't know whether she was hurt or not. The bus operator reported the occurrence to his employer. X-ray pictures taken several months later disclosed respondent had a pelvic fracture which two medical experts said might have dated from the time of the casualty. Appellant's expert thought it was older than that.

. At any rate, respondent continued to work the rest of that day and two days more, but suffered some, and on the third day walked over six blocks to the office of the appellant's claim adjuster. He testified she wanted to talk to him about her claim; and that she told him the circumstances of her injury, and he wrote down her narrative in longhand on both sides of a page of ruled paper. The respondent read and signed it on both sides. It contained a mere recital of her version of the occurrence, and said nothing about her injuries except that her left side was black and blue; that she had had no medical attention; and that she had lost no time from work. It further stated that she didn't get the names of any witnesses, and that she had never before had a claim against the appellant or anyone else.

The claim adjuster further testified that during the conversation the respondent made a demand for $25.00, but there was no discussion of her injury; or about "the medical phase of the accident"; or about X-ray pictures; or about advancing money to her to have X-ray pictures taken. He said he conferred with a superior officer and thereupon offered $10, though denying liability. The respondent accepted, and the adjuster filled in a printed form of release for that consideration, and gave it to her to read. She said nothing about being unable to read it. He requested her to write on a blank line near the bottom, "I understand this release", which she did and then signed it. He thereupon gave her a check for the $10, which she accepted.

Continuing, the claim adjuster testified that about two months later, in March, respondent came back to his office, denied she had signed any release, and said she had had a lot of trouble. But the main purpose of her visit was to ascertain if the appellant still had her claim on file. She said she had some accident and health insurance in a company which was going to pay her doctor bills, and she wanted the adjuster to verify to that company the fact that the claim was on file with appellant. About a month later (in April), the adjuster said, respondent came to his office a third time, demanding that appellant pay her doctor bills then amounting to about $145. The witnesss said he asked her what she thought she ought to have, and she made a demand for $500. He told her to come back in a couple of days, and in the meantime he would consult his superiors. It was his recollection that respondent later called him on the telephone, and he told her the claim had already been settled—for the $10.

The respondent testified she went to the office of appellant's claim adjuster the first time for the purpose of getting its doctor to examine her. She said she asked him if the bus operator had "turned in the report of the accident," and the adjuster answered that he had. Then the adjuster said he "wanted to know all about it." She detailed the occurrence, and said she wanted appellant's doctor to examine her. The adjuster informed her the appellant had no doctor, and advised her to "go to your own doctor, and see how you get along." During the conversation he offered her $10. She told him she would have to have X-rays; that she didn't think her doctor had X-rays, and that she ought to have $25 for that. The adjuster said he would give her $10 for the X-rays and see how she got along. Then she signed the "statement of the accident." Nothing was said about a settlement, and there was none.

She further testified her hearing was bad, and it impliedly appears from the transcript that she was wearing a "hearing aid" when she was on the stand. There are also indications in the transcript that the claim adjuster talked in a low, hard-to-hear voice—at least at the trial. However, respondent admitted she signed the printed release

and wrote in the words "I understand this release." But she said she did not read it, and thought it was to release [422] the appellant from paying the doctors for her X-ray expense, because of the $10 it had paid her. She also corroborated the adjuster's testimony that she did go back to his office twice for the purposes he stated. Her testimony as to the chronology of the events is a little indefinite but from it and other testimony we gather it was about as follows:

Jan. 7, 1946 —the casualty occurred;

Jan. 9, " —the respondent signed the written statement and the printed release presented by the adjuster;

Jan. —, " —respondent was at home 10 days because of a truckers' strike, but returned to work for her original employer;

Feb. —, " —respondent collapsed after changing employers and going to work at Kline's store in the sewing department for three weeks;

Feb. 27, " —respondent called Dr. Cantanzoro, a chiropractor;

Feb.-Mch. " —respondent was at home for 5 weeks;

Mch. —, " —respondent called on the adjuster a second time;

Apr. 1, " —respondent went back to work at Kline's store;

Apr. 21, " —[Easter] respondent quit work and had not been employed since;

Apr. —, " —respondent called on the adjuster a third time and asked for $500 damages;

June 3, " —respondent consulted Dr. Jostes;

June —, " —Dr. Ernst took X-ray pictures;

June 27, " —respondent filed this suit.

This brings us to the crucial point in the case. In explaining why she read the longhand statement of the facts of the casualty written by the adjuster, but did not read the printed release of her claim for damages, the respondent said she had forgotten her glasses that morning, and that she could read longhand writing without her glasses, but could not read print without them. She further said she could read "big headings on newspapers and things like that" without glasses, but not the caption of the release—which was exhibited to her while she was on the stand. Also while on the stand she did read the longhand statement without her glasses. As to the printed release, the adjuster testified that when he submitted it to respondent "she (did not) say anything to (him) one way or the other (about) whether she could or could not read the release" (parentheses ours). And the original release brought up shows she filled in the words "I understand this release" exactly on a printed blank line. There were eleven full printed lines and six wholly or mostly blank lines in it.

Appellant contends, and the dissenting opinion in the Court of Appeals holds, this testimony of respondent was "not reasonably probable and cannot be considered." Respondent contends, and the majority opinion holds: that on appellant's motion for a directed verdict (or an outright reversal here) on the insufficiency of respondent's evidence, it must be viewed in the light most favorable to her; that the parties were not dealing on even terms in view of respondent's age, pain and credulity, and the adjuster's professed fairness; that respondent was not given a copy of the release; and that the inadequate consideration of $10 itself tended to make respondent believe she was not settling her whole claim, but was receiving the money to defray or apply on her X-ray expense, as she swore. Furthermore, as previously stated, the adjuster himself testified that when he handed the release to respondent for her signature she did not say whether she could or couldn't read it, though she did at his request insert therein that she *understood* it—not that she had read it.

Obviously the case was for the jury on the conflicting testimony—unless the appellant's main contention be correct that respondent's testimony was conclusively refuted by the physical evidence furnished by the printed release and the handwritten statement, themselves. Respondent testified she could not read the former (even the caption in larger type) without her glasses, but could read the latter without them. In fact, she said she could not read any print without glasses, other than newspaper headlines and the like. Appellant [423] argues this testimony must be held untrue as a matter of law because the two documents show on their faces that the print was easier to read than the handwriting. For comparison we attach as exhibits at the end of this opinion photostatic copies of a sample section of each, the printing, writing and spacing being shown actual size.

We agree with appellant that the print appears to be easier to read. It so seems to us, though it is true the written words are more flowing —stretched out—and spaced further apart. But can we hold as a matter of law that the same must have been true of respondent? The only expert testimony in the record on this question of vision is that of Dr. Ambrose, appellant's expert. He said he was not an oculist, but had had medical training on diseases of the eye such as all doctors would receive. He expressed the opinion, as a matter of common sense, that there was no physical or mental reason why a person should be able to read handwriting without the use of glasses, and not be able to read printing. In fact he said printing is easier to read than handwriting, indicating, however, that proper vision might have something to do with it. But on cross-examination, in answering the leading question, whether one person "might be able to read print better and someone else might be able to read larger handwriting," he said "I think that is an individual equation."

Whether the doctor's testimony referred to differences in persons as to eye condition or structure, education, habits, personal idiosyncracies or psychopathic conditions, we do not know. Neither may we refer to medical works on the question—if there be such and we could understand them. For they are not independent evidence. 32 C. J. S., p. 627, Sec. 718; Cooper v. A. T. & S. F. Rd. Co., 347 Mo. 555, 567-8(5), 148 S. W. (2d) 773, 780(10). We must take the record as it comes to us, and in view of the doctor's testimony we do not feel justified in saying as a matter of law that respondent's testimony is untrue, though the question is not an easy one.

Even on matters of common knowledge the problem is often one of the most difficult in law. In State ex rel. K. C. So. Ry. Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915, a motorist 22 years old, with no ocular weakness so far as shown, and with his automobile headlights illumined, violently collided with a freight car standing across the highway during unsettled weather at night, after he had first come almost to a stop ten or twelve feet from it. But he testified he did not see it until within six feet thereof. We held on certiorari to the judges of the Kansas City Court of Appeals that he was guilty of contributory negligence as a matter of law, notwithstanding the three judges of that court had ruled the other way. Later the lamented Judge Otis in Moore v. C., B. & Q. Rd. Co., 28 Fed. Supp. 804, 806, distinguished the case, but semi-humorously observed the fact that the three judges of our Court of Appeals had reached a different conclusion did not suggest to us that the question was one on which reasonable men might differ. So, too, here three of the five judges and commissioners of the St. Louis Court of Appeals have reached the conclusion at which we have arrived, and two take the other view. Nevertheless the question must be decided, and in this instance our conclusion is in favor of the witness.

On the broader aspects of the case, particularly appellant's contention that it is controlled by Poe v. Ill. Cent. Rd. Co., 339 Mo. 1025, 99 S. W. (2d) 82, we need only say that decision was based on its facts. It cites several cases where a different conclusion was reached on different facts. And we think there are some facts here which tend to corroborate respondent's testimony that she went to see appellant's adjuster for the sole purpose of getting a doctor to examine her, and never did depart from that intention. It was undisputed that appellant had formerly retained a staff of physicians, though it did not have at that time.

She was a widow 61 years old and suffering pain. She telephoned the appellant the third day after the casualty and was directed to the adjuster's office. She had [424] not consulted a physician and was ignorant of her true condition. The very fact that the interview culminated in a full settlement for her injuries, without the advice of a doctor, for the nominal sum of $10 paid on the spot, indicates the

adjuster was aggressive, and may have led her to believe the $10 was to apply on her X-ray expense, as she testified. When she inserted in the release at the adjuster's request the recital that she "*understood*" it, she may have depended on the adjuster's explanation of the release, and not on a reading or independent understanding of it. We think the case was for the jury.

The briefs here are the ones used by the parties in the Court of Appeals. In appellant's brief there are two assignments on an instruction and one asking a mistrial on the testimony of two witnesses. But they were not elaborated in the argument and we find no merit in them.

For all the reasons stated, the judgment of the trial court is affirmed. All concur.

**RELEASE AND SETTLEMENT OF CL**

**FOR THE SOLE CONSIDERATION** of ...... *Ten* ...... *and* ......

forever discharge ST. LOUIS PUBLIC SERVICE COMPANY from any and all (
) way growing out of any and all known and unknown personal injuries and p

i an accident which occurred on or about ...... *June 7th* ......
i indemnify and save harmless the said ST. LOUIS PUBLIC SERVICE COMPAN
sing out of the injuries or damage sustained by me/us. It is further agreed tha
to me/us for damages as a result of this accident, the execution of this agreement
claim against such other parties to the extent of the pro rata share of the parties

·ranted by me/us that no promise or inducement has been offered except as hei
l without reliance upon any statement or representation of the person or partie
ting the nature and extent of the injuries, damages and/or legal liability the
n set forth herein is in full accord and satisfaction of a disputed claim.

*is Elizabeth A. Schubert, A*
*61, widow. I am employed*
*L Fuller, stock room, I reside*
*years, prior to the, 3704 Thu*

[425] *[handwritten text, partially illegible]*